[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 10, 2005
THOMAS K. KAHN
CLERK**

————————————————

Nos. 01-14872 and 01-15080

————————————————

D. C. Docket Nos. 99-00026-CR-01-2
and 01-00032-CR-01-2-WCO

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAY SCOTT BALLINGER,

Defendant-Appellant.

————————————————

Appeals from the United States District Court
for the Northern District of Georgia

————————————————

**(January 10, 2005)**

Before EDMONDSON, Chief Judge, and TJOFLAT, ANDERSON, BIRCH,
DUBINA, BLACK, CARNES, BARKETT, HULL, MARCUS, WILSON, PRYOR
and HILL*, Circuit Judges.

_____

*Honorable James C. Hill, elected to participate in this decision pursuant to 28 U.S.C.
§46(c).

MARCUS, Circuit Judge:

Jay Scott Ballinger appeals his convictions for five counts of destruction of religious property on account of their religious character, in violation of 18 U.S.C. § 247. Ballinger claims that § 247 is an unconstitutional exercise of Congress' commerce power, both facially and as applied to his offenses. Moreover, he argues that § 247 does not, by its express terms, reach his conduct, which involved traveling by car on the interstate highways and crossing the borders of four states for the purpose of burning churches. After reviewing the substance of Congress' commerce power, we have little trouble concluding that § 247, both facially and as applied to Ballinger, is a constitutional expression of Congress' well-established power to regulate the channels and instrumentalities of interstate commerce in order to prevent their use for harmful purposes. Furthermore, the well-settled meaning of the "in commerce" jurisdictional language employed by Congress in § 247 leads us to conclude that Ballinger's conduct falls squarely within the scope of the statute. Accordingly, we affirm.

I.

A.

On April 20, 1999, a federal grand jury in the Northern District of Georgia returned an indictment charging Jay Scott Ballinger with three counts of

intentionally destroying religious property, in violation of 18 U.S.C. § 247, and three counts of using fire to commit those offenses, in violation of 18 U.S.C. § 844(h). One month later, on May 20, 1999, a federal grand jury in the Middle District of Georgia indicted Ballinger on two additional counts of intentionally destroying religious property, in violation of 18 U.S.C. § 247, and two additional counts of using fire to commit those offenses, in violation of 18 U.S. C. § 844(h). On December 14, 2000, Ballinger moved to dismiss the indictment in the Northern District of Georgia on the ground that the alleged offenses lacked a sufficient nexus with interstate commerce, and the United States Magistrate Judge recommended that the motion be denied.

Four months later, Ballinger entered a negotiated guilty plea in the United States District Court for the Northern District of Georgia. Ballinger pled guilty to the three counts of intentionally destroying religious property in violation of 18 U.S.C. § 247 charged in the Northern District of Georgia, and, pursuant to Federal Rule of Criminal Procedure 20, he pled guilty to the two counts of violating § 247 charged in the Middle District of Georgia. As part of the plea agreement, Ballinger expressly preserved "the right to appeal the constitutionality of § 247 under the Commerce Clause, U.S. Const., Art. I, § 8, cl. 3, both on its face and as applied to him." The magistrate judge recommended that the district court accept Ballinger's

3

guilty plea, and in an order issued July 13, 2001, the district court approved and adopted the magistrate's Report and Recommendation in its entirety, concluding that § 247 was constitutional both facially and as applied. Thereafter, the district court sentenced Ballinger to life imprisonment on the count of violating § 247 that had resulted in the death of a volunteer firefighter who fought the blaze at one of the burned churches, and to 240 months' imprisonment, to run concurrently, on each of the four remaining counts.

Ballinger appealed on Commerce Clause grounds, and a divided panel of this Court reversed his convictions. The panel held that although § 247 was a constitutional exercise of the commerce power, Ballinger's conduct did not fall within the ambit of the statute. United States v. Ballinger, 312 F.3d 1264, 1276 (11th Cir. 2002). On May 12, 2004, this Court vacated the panel opinion and directed that the case be heard en banc. United States v. Ballinger, 369 F.3d 1238 (11th Cir. 2004) (en banc).

### B.

The parties to this case stipulated to the following essential facts[1] as part of the negotiated plea agreement. Ballinger is a practicing "Luciferian," and considers

---

[1]We do not summarize a substantial body of stipulated facts regarding the burned churches' involvement in commerce because we have no occasion today to reach the issue of whether the churches engaged in or otherwise substantially affected interstate commerce.

4

himself a missionary of Lucifer. He has expressed hostility toward organized Christianity, and describes the burning of churches as his "work" and his "business."

In December 1998, Ballinger and his girlfriend, Angela Wood, left Indiana in Ballinger's Indiana-registered van, partly out of concern about a call to Ballinger's parents' Indiana home by an FBI agent. Ballinger and Wood traveled in Ballinger's van to Georgia, passing through Kentucky and Tennessee, and using interstate highways, purchasing gasoline and other goods, and staying in hotels all along the way. On the way to Georgia, Ballinger deliberately set fire to three churches in three states: the Mt. Eden Christian Church in Scottsburg, Indiana, on or about December 20, 1998; the Bolton Schoolhouse Missionary Baptist Church in Bonnieville, Kentucky, on or about December 21, 1998; and the Little Hurricane Primitive Baptist Church in Manchester, Tennessee, on or about December 22, 1998.

Ballinger arrived in Dalton, Georgia on December 22, 1998, and checked into the Best Inns of America Hotel. At 7:10 p.m., he used his Indiana Visa card to purchase a plastic gas can from the Dalton K-Mart store. At approximately 1:30 a.m. on December 23, 1998, Ballinger drove his van to the Amazing Grace Baptist Church, broke a church window using a tool he had brought from Indiana, poured

5

gasoline into the broken window, and set fire to the church with a cigarette lighter. The fire completely destroyed the Amazing Grace Baptist Church. After setting that fire, Ballinger drove his van back to the Dalton Best Inns of America Hotel, where he spent the night.

The following night, Ballinger drove his van to the Mountain View Baptist church and deliberately burned its fellowship hall at approximately 1:09 a.m. on December 24, 1998. Again, Ballinger used a tool from his van to break a window, poured gasoline into the broken window, and set fire to the church, before driving away. The fire badly damaged the church's fellowship hall.

Ballinger and Wood checked out of the Dalton Best Inns of America Hotel and drove Ballinger's van to the Athens, Georgia area, where they checked into the Perimeter Inn on December 26, 1998. Along the way, Ballinger drove to the Sardis Full Gospel Church in Walton County and burned its fellowship hall, too, at approximately 12:53 a.m. on December 25, 1998, utterly destroying the building. Again, Ballinger started the fire by breaking a church window and pouring in gasoline. Ballinger then stayed at the Perimeter Inn in Athens until January 16, 1999. During his stay, shortly before 9:15 a.m. on December 31, 1998, Ballinger drove his van to the New Salem United Methodist Church in Banks County, Georgia. Again, he broke a window using a tool from his van, poured in gasoline,

6

and set fire to the church. Before destroying the church completely, the fire caused the roof to collapse, killing volunteer firefighter Loy Williams and injuring three other volunteer firefighters.

Ballinger returned to the Perimeter Inn, where he stayed until approximately 11:30 p.m., when he drove to the Johnson United Methodist Church in Oconee County, Georgia. Once again, Ballinger used a tool from his van to break a church window, poured in gasoline, and set fire to the church, before driving back to his hotel. The fire badly damaged the church.

Ballinger checked out of the Perimeter Inn on January 16, 1999, and drove his van back to Indiana. Again he used the interstate highways, purchased gasoline and other goods, and stayed in hotels throughout the trip. Along the way back, he set fire to three more churches: the Cedar Grove Baptist Church in Franklin, Kentucky, on January 17, 1999; the Pleasant Hill Methodist Church in Elkton, Kentucky, on January 17-18; and the New Harmony Baptist Church in Beaver Dam, Kentucky, on January 18, 1999. During his travels, Ballinger crossed interstate borders six times, traveling from Indiana into Kentucky, from Kentucky into Tennessee, from Tennessee into Georgia, and then from Georgia back to Tennessee, then Kentucky, and finally Indiana. He burned a total of eleven churches during the course of this single arson spree.

7

II.

Ballinger was convicted under Title 18 U.S.C. § 247, which provides in

relevant part:

> (a)   Whoever, in any of the circumstances referred to in subsection (b) of
>        this section--
>    (1)   intentionally defaces, damages, or destroys any religious real
>          property, because of the religious character of that property, or
>          attempts to do so; or
>    (2)   intentionally obstructs, by force or threat of force, any person in
>          the enjoyment of that person's free exercise of religious beliefs,
>          or attempts to do so;
> shall be punished as provided in subsection (d).
>
> (b)   The circumstances referred to in subsection (a) are that the offense is
>        in or affects interstate or foreign commerce.

We understand Ballinger as having made three separate, though overlapping

arguments for overturning his convictions under § 247. First, Ballinger says that §

247 is facially unconstitutional -- that is, under no circumstances does Congress

have the commerce power to proscribe the intentional destruction of religious

property in or affecting commerce. Second, Ballinger claims that § 247 is

unconstitutional as applied to his conduct -- that is, even if Congress has the power

to reach some offenses, it is not empowered to reach conduct like Ballinger's.[2]

_____

[2]Although Ballinger purports to be making a facial as well as an as-applied challenge,
see, e.g., Appellant's Panel Br. at 17, we read him as making the latter more than the former.
For one thing, the Appellant described to the en banc Court at oral argument types of conduct
that he believed would fall within the permissible scope of the statute, a position wholly
inconsistent with facial unconstitutionality. See United States v. Salerno, 481 U.S. 739, 745, 107
S. Ct. 2095, 95 L. Ed. 2d 697 (1987) ("A facial challenge to a legislative Act is, of course, the

8

Finally, the argument that Ballinger has cast as an as-applied challenge to the constitutionality of § 247 seems really to raise a question of statutory construction -- namely, whether, by its specific terms, § 247 covers Ballinger's conduct. The substance of the argument is that "there was insufficient evidence to show that the offenses in this case were 'in or affecting commerce,'" Appellant's Panel Br. at 16, raising the issue of whether the statutory language contemplates offenses like Ballinger's. The first two questions are easily resolved, and we address them at the outset; the third is more involved, and is at the heart of this case.

A.

We review the constitutionality of a statute de novo. United States v. Scott, 263 F.3d 1270, 1271 (11th Cir. 2001). To determine whether § 247 is a valid exercise of Congress' commerce power, we begin with an overview of the nature of that power. Article I, § 8 of the United States Constitution provides that "The Congress shall have the Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cls. 1 & 3.

most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."). Moreover, the Appellant's brief to the panel in fact argued that "[t]he 'offense' of burning a religious structure can 'affect interstate commerce' only if the structure is in that same commerce," Appellant's Panel Br. at 44, again suggesting that there are, indeed, some church burnings that § 247 may constitutionally reach.

The Supreme Court's landmark decision in United States v. Lopez, 514 U.S. 549, 115 S. Ct. 1624, 131 L. Ed. 2d 626 (1995), which issued shortly before Congress amended § 247 in 1996, synthesized more than a century of Commerce Clause activity into a definitive description of the commerce power. In Lopez, the Court addressed the constitutionality of the Gun-Free School Zones Act of 1990, 18 U.S.C. § 922(q) (1988 ed., Supp. V), which prohibited possession of a firearm within a thousand feet of a school. Because the statute criminalized intrastate conduct without including any jurisdictional hook to "ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce," Lopez, 514 U.S. at 561, the Court found that it exceeded the scope of Congress' commerce power. In reaching this conclusion, Chief Justice Rehnquist, writing for the Court, laid out "three broad categories of activity that Congress may regulate under its commerce power": "First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce." Id. at 558-59 (citations omitted); see

10

also, e.g., United States v. Morrison, 529 U.S. 598, 608-09, 120 S. Ct. 1740, 146 L. Ed. 2d 658 (2000) (reiterating these categories); Scott, 263 F.3d at 1271-72 (reiterating the Lopez categories).

Channels of commerce are "the interstate transportation routes through which persons and goods move." Morrison, 529 U.S. at 613 n.5 (quoting United States v. Lankford, 196 F.3d 563, 571-572 (5th Cir. 1999)). These channels include highways,[3] see, e.g., Pierce County v. Guillen, 537 U.S. 129, 147, 123 S. Ct. 720, 154 L. Ed. 2d 610 (2003); United States v. Pappadopoulos, 64 F.3d 522, 527 (9th Cir. 1995); United States v. New Buffalo Amusement Corp., 600 F.2d 368, 391 n.4 (2d Cir. 1979), railroads, navigable waters, and airspace, see, e.g., Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., 313 U.S. 508, 516-18, 61 S. Ct. 1050, 85 L. Ed. 1487 (1941); Escanaba & Lake Mich. Transp. Co. v. City of Chicago, 107 U.S. 678, 682, 17 Otto 678, 2 S. Ct. 185, 27 L. Ed. 442 (1883); United States v. Ho, 311 F.3d 589, 597 (5th Cir. 2002); Ickes v. FAA, 299 F.3d

---

[3]We characterize highways as channels of commerce, since they are routes for the interstate transportation of people and goods. However, it bears noting that roads resemble instrumentalities of commerce in certain respects as well (for example, unlike oceans and airways, they are artificially constructed and -- albeit at some cost -- moveable); thus, the Supreme Court has variously labeled highways both as channels and as instrumentalities. Compare Pierce County, 537 U.S. at 147 (channels); and Oklahoma ex rel. Phillips, 313 U.S. at 518 (channels), with Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 197, 95 S. Ct. 392, 42 L. Ed.2 d 378 (1974) (instrumentalities); Alstate Const. Co. v. Durkin, 345 U.S. 13, 16, 73 S. Ct. 565, 97 L. Ed. 745 (1953) (instrumentalities); Overstreet v. N. Shore Corp, 318 U.S. 125, 129-30, 63 S. Ct. 494, 87 L. Ed. 656 (1943) (instrumentalities); and Monongahela Navigation Co. v. United States, 148 U.S. 312, 342, 13 S. Ct. 622, 37 L. Ed. 463 (1893) (instrumentalities).

11

260, 263 (3d Cir. 2002); Gibbs v. Babbitt, 214 F.3d 483, 490-91 (4th Cir. 2000), as well as telecommunications networks, see, e.g., Ho, 311 F.3d at 597; Gibbs, 214 F.3d at 490-91, and national securities markets, see, e.g., Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 292 F.3d 1334, 1347 (11th Cir. 2002).

Instrumentalities of interstate commerce, by contrast, are the people and things themselves moving in commerce, including automobiles, airplanes, boats, and shipments of goods. See, e.g., Perez v. United States, 402 U.S. 146, 150, 91 S. Ct. 1357, 28 L. Ed. 2d 686 (1971); United States v. Hickman, 179 F.3d 230, 232 (5th Cir. 1999); United States v. Cobb, 144 F.3d 319, 322 (4th Cir. 1998); United States v. McHenry, 97 F.3d 125, 126 (6th Cir. 1996); United States v. Bishop, 66 F.3d 569, 588 (3d Cir. 1995); United States v. Oliver, 60 F.3d 547, 550 (9th Cir. 1995). Instrumentalities of commerce include, as well, "pagers, telephones, and mobile phones." United States v. Pipkins, 378 F.3d 1281, 1295 (11th Cir. 2004).

Plainly, congressional power to regulate the channels and instrumentalities of commerce includes the power to prohibit their use for harmful purposes, even if the targeted harm itself occurs outside the flow of commerce and is purely local in nature. See, e.g., Lopez, 514 U.S. at 558-59; Brooks v. United States, 267 U.S. 432, 436, 45 S. Ct. 345, 69 L. Ed. 699 (1925) ("Congress can certainly regulate interstate commerce to the extent of forbidding and punishing the use of such

12

commerce as an agency to promote immorality, dishonesty, or the spread of any evil or harm to the people of other states from the state of origin."); Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 256, 85 S. Ct. 348, 13 L. Ed. 2d 258 (1964) ("[T]he authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question." (quoting Caminetti v. United States, 242 U.S. 470, 491, 37 S. Ct. 192, 61 L. Ed. 442 (1917))). Congress has repeatedly used this power to reach criminal conduct in which the illegal acts ultimately occur intrastate, when the perpetrator uses the channels or instrumentalities of interstate commerce to facilitate their commission. Title 18 U.S.C. § 1952, for example, reaches a broad range of purely intrastate criminal conduct -- including extortion, bribery, drug distribution, prostitution, and, indeed, arson -- when the offender travels in or uses the facilities of interstate commerce. See 18 U.S.C. § 1952(a)-(b); see also, e.g., 18 U.S.C. § 1951 (prohibiting robbery and extortion that "in any way or degree obstructs, delays, or affects commerce"); 18 U.S.C. § 1958 (prohibiting travel in or the use of any facility of interstate commerce to commit murder for hire).

Congress' power to regulate activities that "affect" commerce enables it to reach wholly intrastate conduct -- that is, conduct that utilizes neither the channels

nor the instrumentalities of interstate commerce -- but only when it has "a substantial relation to" (meaning it "substantially affect[s]") interstate commerce. Lopez, 514 U.S. at 558-59. This third Lopez prong is the broadest expression of Congress' commerce power. See, e.g., Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co., 334 U.S. 219, 232 & n.11, 68 S. Ct. 996, 92 L. Ed. 1328 (1948).

B.

The constitutional issue this case raises is whether the Commerce Clause, found in Article I, § 8, clauses 1 and 3 of the United States Constitution, permits Congress to proscribe the conduct of an arsonist who travels by car on the interstate highways through four states, apparently for no other purpose than to burn churches to the ground. We need not and do not reach the question of whether § 247 constitutes a permissible regulation under the third Lopez prong of activity affecting commerce,[4] since the statute falls squarely within Congress' power under the first two Lopez prongs to regulate the channels and instrumentalities of commerce. Ballinger set fire to at least eleven churches in four states during the course of his interstate arson spree. This is precisely the sort of

_____

[4]Accordingly, we offer no opinion as to whether the church burnings in this case affected interstate commerce, either because the churches were engaged in commerce prior to their destruction or because their activities were sufficiently interstate in nature that they otherwise substantially affected interstate commerce. Moreover, we need not and do not address the question -- briefed to the en banc Court by both parties -- of whether any effects the church burnings might have on commerce may be aggregated for purposes of the Lopez analysis.

14

conduct that may be regulated under Congress' well-established power to forbid or punish the use of the channels and instrumentalities of interstate commerce "to promote . . . the spread of any evil or harm to the people of other states from the state of origin." Brooks, 267 U.S. at 436. The Commerce Clause contemplates congressional efforts "to keep the channels of interstate commerce free from immoral and injurious uses." Heart of Atlanta, 379 U.S. at 256 (quoting Caminetti, 242 U.S. at 491). Surely, utilizing the channels and instrumentalities of commerce to facilitate a prolonged, multistate church-burning spree qualifies as an "injurious use" that Congress may proscribe pursuant to its commerce power.

The Appellant argues, nevertheless, that Congress' power over the channels and instrumentalities of commerce authorizes it to proscribe only those harmful activities whose ultimate actus reus occurs within a channel of commerce, see Appellant's Panel Br. at 38-40, or constitutes an attack on an instrumentality of commerce, see id. at 29-30, 35-38. Ballinger says that Congress' power to regulate the channels of commerce does not authorize it to regulate "an activity that merely implicates or invokes the use of the channels of commerce," id. at 39; arson, the argument continues, is an act consummated outside the channels of commerce, and thus beyond the reach of the commerce power. Nor, the Appellant asserts, does Congress' power to regulate the instrumentalities of commerce authorize § 247,

15

because the statute regulates church buildings, which do not themselves constitute instrumentalities of commerce.    Id. at 29-30.

These arguments misconceive the nature of Congress' commerce authority. The commerce power has always been construed by the Supreme Court to include the power to prohibit the use of the channels or instrumentalities of interstate commerce "to promote immorality, dishonesty, or the spread of any evil or harm to the people of other states from the state or origin."  Brooks, 267 U.S. at 436 (emphasis added).  An act that promotes harm, not the harm itself, is all that must occur in commerce to permit congressional regulation.  In fact, it is a "well-settled principle that Congress may impose relevant conditions and requirements on those who use the channels of interstate commerce in order that those channels will not become the means of promoting or spreading evil, whether of a physical, moral or economic nature."  United States v. Orito, 413 U.S. 139, 144, 93 S. Ct. 2674, 37 L. Ed. 2d 513 (1973) (quoting N. Am. Co. v. SEC, 327 U.S. 686, 705, 66 S. Ct. 785, 90 L. Ed. 945 (1946)) (emphasis added); see also Am. Power & Light Co. v. SEC, 329 U.S. 90, 99, 67 S. Ct. 133, 91 L. Ed. 103 (1946) (emphasis added); Ky. Whip & Collar Co. v. Ill. Cent. R.R. Co., 299 U.S. 334, 347, 57 S. Ct. 277, 81 L. Ed. 270 (1937) ("The anticipated evil or harm may proceed from something inherent in the subject of transportation as in the case of diseased or noxious articles, which are

16

unfit for commerce. Or the evil may lie in the <u>purpose</u> of the transportation, as in the case of lottery tickets, or the transportation of women for immoral purposes." (emphasis added)).

These precedents leave no doubt that the commerce power contemplates congressional regulation of the channels and instrumentalities of commerce in order to prevent their use to facilitate harmful acts, which may be consummated -- and whose effects ultimately may be felt -- outside the flow of commerce. In enacting § 247, Congress was attempting to do just that -- to prevent what it characterized as the evil of church burnings, which had become a national epidemic, from spreading from state to state through the channels and instrumentalities of interstate commerce. <u>See</u> H.R. Rep. No. 104-621, at 2, <u>reprinted in</u> 1996 U.S.C.C.A.N. 1082, 1083.

Congress acted well within the bounds of its commerce power when it enacted legislation to prevent conduct like Ballinger's, which entailed weeks of travel in a van (an instrumentality of commerce) along interstate highways (a channel of commerce) and at least six separate interstate border crossings, all for the specific purpose of spreading the evil of church burning through four different states. As the dissent from the earlier panel opinion put it: "Ballinger's actions placed him squarely within the bounds of Congress's power to regulate because he

17

used interstate commerce as an agency to promote criminal acts of arson. In addition to the obvious fact that it was necessary for him to travel across state lines in order to commit arson in Georgia (as well as Tennessee and Kentucky), the immediacy with which he set out to destroy churches once he arrived and the absence of any indication that he had other business in Georgia demonstrate that he used the channels of interstate commerce for the purpose of committing arson."

Ballinger, 312 F.3d at 1278 (Hall, J., dissenting).[5]

---

[5]Contrary to the suggestion in Judge Birch's dissent, the question before us is not whether Congress has the power to proscribe purely intrastate acts of arson. The statute that Judge Birch would condemn as an unconstitutional intrusion on state authority is not a flat proscription on church arson. Rather, § 247 contains an explicit requirement of an appropriate nexus with interstate commerce, so that church arson may be prosecuted only when "the offense is in or affects interstate or foreign commerce." § 247(b). Chief Justice Rehnquist, writing for the Court in Lopez, made it abundantly clear that a federal criminal statute that contains "an express jurisdictional element" capable of "limit[ing] its reach to a discrete set of [offenses] that additionally have an explicit connection with or effect on interstate commerce" is substantially different from a statute that contains no such jurisdictional element, and must be treated differently. See Lopez, 514 U.S. at 561 (contrasting the statute at issue in that case, which contained no jurisdictional element, with the statute at issue in United States v. Bass, 404 U.S. 336, 92 S. Ct. 515, 30 L. Ed. 2d 488 (1971), which did have such a component). When a statute expressly requires that the proscribed conduct have an appropriate nexus with interstate commerce, courts can "ensure, through case-by-case inquiry," that each application of the statute is constitutional, and thus the statute should not be struck down as being facially unconstitutional. See id. (observing that the Bass Court appropriately "set aside the [firearm possession] conviction because . . . the Government . . . had failed 'to show the requisite nexus with interstate commerce,'" and thereby "interpreted the statute to reserve the constitutional question whether Congress could regulate, without more, the 'mere possession' of firearms") (citing United States v. Five Gambling Devices, 346 U.S. 441, 448, 74 S. Ct. 190, 98 L. Ed. 179 (1953) (plurality opinion) ("The principle is old and deeply imbedded in our jurisprudence that this Court will construe a statute in a manner that requires decision of serious constitutional questions only if the statutory language leaves no reasonable alternative.")).

Congress drafted the amended § 247 to include, as an element of the statutorily defined crime, the requirement that the offense occur in or affect commerce. To treat this statute as if it contained no nexus to interstate commerce, but rather as if it simply proscribed wholly intrastate

18

Moreover, as the Appellant himself acknowledges, Congress has repeatedly acted pursuant to its commerce power to regulate use of the channels and instrumentalities of commerce to proscribe criminal conduct. Ballinger himself cites numerous statutes that prohibit movement through the channels of commerce and/or use of the instrumentalities of commerce for various purposes, including: 18 U.S.C. § 43 (to engage in animal enterprise terrorism); 18 U.S.C. § 228 (to avoid paying child support); 18 U.S.C. § 1073 (to avoid prosecution); 18 U.S.C. § 1074 (to avoid prosecution for destroying property); 18 U.S.C. § 1231 (to engage in strikebreaking); 18 U.S.C. § 1958 (to commit murder for hire); 18 U.S.C. § 2101 (to cause a riot); 18 U.S.C. § 2118 (to engage in robbery involving controlled substances); 18 U.S.C. § 2261 (to commit domestic violence); 18 U.S.C. § 2261A (to commit stalking); 18 U.S.C. § 2262 (to violate a domestic protective order); 18 U.S.C. § 2423 (to provide minors for sex). These statutes clearly illustrate Congress' power to punish offenders like Ballinger, who rely on the channels and

___

acts of church arson, would require us to ignore the explicit interstate commerce language contained in the statute. If Congress had asserted its commerce power to proscribe church burnings without requiring that the offenses occur in or affect interstate commerce, the resulting legislation would have raised a substantial constitutional question. However, that question is not present here since we cannot discard the jurisdictional language that Congress, mindful of Lopez, employed for the express purpose of situating § 247 within the constitutional bounds of its commerce power. See H.R. Rep. No. 104-621, at 7, reprinted in 1996 U.S.C.C.A.N. 1082, 1088. By giving proper effect to the statute's jurisdictional element, we preserve our tradition of federalism and Congress' longstanding Article I commerce power, both of which have deep roots in the Constitution.

instrumentalities of commerce in committing criminal acts.[6]

Ballinger urges us to distinguish these statutes from § 247, suggesting that they "are examples of proper use of the Commerce Clause by regulating an instrumentality of or a thing in interstate commerce. In contrast, the language of § 247 does not require anything to move in commerce." Appellant's Panel Br. at 36-37. The difference, according to the Appellant, is that these statutes "regulate crime by focusing on the criminal's movement in interstate commerce." Id. at 36. This analysis, however, conflates the constitutional question with the statutory interpretation question. The question of whether Congress has the constitutional authority to proscribe Ballinger's conduct is entirely distinct from the question of whether the statutory language Congress employed actually reached that conduct. Appellant, in fact, seems to concede that Congress constitutionally could have proscribed Ballinger's offenses, simply by rewording the statute to "focus[]on the

---

[6]The dissent from the panel opinion also cites a number of early Supreme Court cases upholding similar congressional exercises of commerce power. See Ballinger, 312 F.3d at 1277 (Hall, J., dissenting) (citing Brooks v. United States, 267 U.S. 432, 45 S. Ct. 345, 69 L. Ed. 699 (1925), which upheld a statute prohibiting the transportation across state lines of stolen automobiles; Caminetti v. United States, 242 U.S. 470, 37 S. Ct. 192, 61 L. Ed. 442 (1917), which upheld a statute prohibiting the transportation of women across state lines for the purpose of concubinage; Hoke v. United States, 227 U.S. 308, 33 S. Ct. 281, 57 L. Ed. 523 (1913), which upheld a statute prohibiting inducing a woman to travel in interstate commerce for the purpose of prostitution; and Champion v. Ames, 188 U.S. 321, 23 S. Ct. 321, 47 L. Ed. 492 (1903), which upheld a statute barring the transportation across state lines of lottery tickets).

20

criminal's movement in interstate commerce." Id.[7]

Thus, for the purpose of determining the constitutionality of proscribing Ballinger's conduct, it is sufficient to say that Congress' commerce authority includes the power to punish a church arsonist who uses the channels and instrumentalities of interstate commerce to commit his offenses. Given that Congress has the power to proscribe Ballinger's conduct, we turn to the remaining question of whether, in enacting § 247, Congress actually did so.

---

[7]Not all of the statutes the Appellant cites actually focus on the travel rather than on the offense. Title 18 U.S.C. § 2118(a), for example, provides: "Whoever takes or attempts to take from the person or presence of another by force or violence or by intimidation any . . . controlled substance . . . shall . . . be fined . . . or imprisoned . . . if . . . (2) the person who engaged in such taking or attempted such taking traveled in interstate or foreign commerce or used any facility in interstate or foreign commerce to facilitate such taking or attempt." Plainly, this provision is worded to focus on punishing the act of taking property, not the travel in or use of a facility of interstate commerce.

Other statutes further illustrate the formalistic nature of the Appellant's suggestion that Congress can only proscribe travel in commerce to commit a crime, not the crime itself. Thus, for example, 21 U.S.C. § 331(k) prohibits "[t]he alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing of any other act with respect to, a food, drug, device, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded." 21 U.S.C. § 331(k) (emphasis added). In fact, the Supreme Court has upheld § 331(k) (then codified as 21 U.S.C. § 301(k)) as a valid exercise of commerce power. See United States v. Sullivan, 332 U.S. 689, 68 S. Ct. 331, 92 L. Ed. 297 (1948); see also United States v. Evers, 643 F.2d 1043 (5th Cir. Apr. 27, 1981) (noting the Supreme Court's holding in Sullivan and applying the statute accordingly).

Similarly, the Supreme Court held in Scarborough v. United States, 431 U.S. 563, 97 S. Ct. 1963, 52 L. Ed. 2d 582 (1977), that under 18 U.S.C. § 1202(a), which punishes felons who "possess[] . . . in commerce" a firearm, the offense of possession need not have "a present nexus with commerce." Id. at 571-72. Rather, the firearm need only have moved in commerce at some time prior to the felon's possession of it. See, e.g., United States v. Dupree, 258 F.3d 1258, 1260 (11th Cir. 2001) (upholding the constitutionality of 18 U.S.C. § 922(g), the successor statute to § 1202(a)).

21

III.

The central question this appeal raises is whether § 247 is properly interpreted as prohibiting the use of the channels and instrumentalities of commerce to commit church arson, or whether the statute merely proscribes arsons in which the burning of the church itself occurs in commerce or affects commerce. Ballinger takes the position that arson is a purely intrastate activity that can rarely, if ever, be "in commerce." In this view, the crime of arson occurs only at the precise "point when the arsonist starts the fire," Appellant's En Banc Br. at 20; this point, therefore, is the only one relevant to determining whether the offense is "in commerce." "[T]ravel prior to the offense is not relevant," Ballinger maintains, because it is not part of the offense. Id. at 29. Accordingly, he reads § 247's provision that "the offense is in or affects" commerce as requiring that the defendant commit the ultimate actus reus of igniting the church "in commerce." Ballinger is less than clear about what, precisely, he believes must transpire "in commerce" to satisfy the statute; what is clearly insufficient, though, in his view, is "[t]raveling [in interstate commerce] or using facilities or instrumentalities [of interstate commerce] before or after committing the offense." Id. In other words, Ballinger envisions the statute as proscribing only those offenses in which the precise meeting of flame and church occurs in commerce -- not those in which the

22

offender relies on the channels and instrumentalities of commerce to carry out the offense. We disagree with this unusually limited reading of § 247.

A.

The fundamental flaw in Appellant's reading of § 247 is that it misconceives the structure of the commerce power and the linguistic tools employed by Congress in defining the jurisdictional reach of § 247. An interpretation of any statute enacted pursuant to the commerce power must be informed by the content and contours of Congress' authority under the Commerce Clause and the linguistic tools at its disposal to exert that power. In the case of § 247, only when the statutory language is removed completely from the backdrop of the commerce power from which it arises is there any ambiguity about its meaning. A glance at the history of Commerce Clause legislation that preceded and informed § 247's enactment makes plain that § 247's express jurisdictional language -- requiring that the offense is "in or affects commerce" -- is a term of art, whose settled, specialized meaning can and must be given effect.

As we have already said, the Supreme Court in Lopez articulated three broad categories of Congress' Commerce Clause authority: regulation of the channels of interstate commerce; regulation of the instrumentalities of interstate commerce; and regulation of intrastate conduct that substantially affects interstate commerce.

23

See Lopez, 514 U.S. at 558-59.  Congress may invoke any or all of these three categories of commerce power in any piece of legislation. For this purpose, the Supreme Court has taught, Congress has at its disposal a specialized set of linguistic tools that enable it to clearly express just what type of commerce authority it is asserting.

The history of Commerce Clause enactments reveals that the terms "in commerce" and "affecting commerce" are ones Congress uses regularly to create federal jurisdiction pursuant to its commerce power, and thus these terms have taken on particularized meanings.  See, e.g., Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 115, 121 S. Ct. 1302, 149 L. Ed. 2d 234 (2001) (observing that "Congress uses different modifiers to the word 'commerce' in the design and enactment of its statutes," and that these modifiers have taken on very particular meanings); United States v. Am. Building Maintenance Indus., 422 U.S. 271, 280, 95 S. Ct. 2150, 45 L. Ed. 2d 177 (1975) (observing that Congress has "repeatedly acknowledged its recognition of the distinction between legislation limited to activities 'in commerce,' and an assertion of its full Commerce Clause power so as to cover all activity substantially affecting interstate commerce").  The "in commerce" language denotes the first two Lopez categories -- regulation of the channels and of the instrumentalities of commerce.  The "affecting commerce"

24

language invokes the third <u>Lopez</u> category -- regulation of intrastate activities that substantially affect commerce.

The words "affecting commerce," as the Supreme Court has repeatedly explained, are "words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power." <u>Citizens Bank v. Alafabco, Inc.</u>, 539 U.S. 52, 56, 123 S. Ct. 2037, 156 L. Ed. 2d 46 (2003); <u>see also</u> <u>Circuit City Stores</u>, 532 U.S. at 115 ("The phrase 'affecting commerce' indicates Congress' intent to regulate to the outer limits of its authority under the Commerce Clause."); <u>Jones v. United States</u>, 529 U.S. 848, 856, 120 S. Ct. 1904, 146 L. Ed. 2d 902 (2000) (noting "the recognized distinction between legislation limited to activities 'in commerce' and legislation invoking Congress's full power over activity substantially 'affecting . . . commerce'"); <u>Allied-Bruce Terminix Cos. v. Dobson</u>, 513 U.S. 265, 277, 115 S. Ct. 834, 130 L. Ed. 2d 753 (1995) ("[T]he words 'affecting commerce' . . . normally mean a full exercise of constitutional power"); <u>United States v. Odom</u>, 252 F.3d 1289, 1293 (11th Cir. 2001). Accordingly, these words invoke the third and broadest <u>Lopez</u> category -- the power to regulate activities that substantially "affect" commerce.

The words "in commerce," in sharp contrast, have a much narrower meaning. The Court has not defined the exact parameters of the term, which may

25

vary by context, see Am. Building Maintenance, 422 U.S. at 277 ("The phrase 'in commerce' does not, of course, necessarily have a uniform meaning whenever used by Congress."); it has, however, stressed repeatedly that "in commerce" is a phrase that expresses Congress' intent to invoke less than the full reach of its commerce power. The Court has explained that, "[u]nlike [the phrases 'involving commerce' and 'affecting commerce'], . . . the general words 'in commerce' and the specific phrase 'engaged in commerce' are understood to have a more limited reach. . . . [T]he words 'in commerce' are 'often-found words of art' that we have not read as expressing congressional intent to regulate to the outer limits of authority under the Commerce Clause." Circuit City Stores, 532 U.S. at 115-16 (quoting Allied-Bruce, 513 U.S. at 273); see also Am. Building Maintenance, 422 U.S. at 276 (noting that the "distinct" and "narrow" jurisdictional phrase "in commerce" "cannot be satisfied merely by showing that the [activities in question] affect commerce" (citation and internal quotation marks omitted)); id. at 280 (noting that by 1950, "the phrase 'engaged in commerce' had long since become a term of art, indicating a limited assertion of federal jurisdiction"); Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 195, 95 S. Ct. 392, 42 L. Ed. 2d 378 (1974).

Thus, a statute employing the language "in commerce," the Court has said, covers "only persons or activities within the flow of interstate commerce." Allied-

Bruce, 513 U.S. at 273 (quoting Am. Building Maintenance, 422 U.S. at 276 (quoting Gulf Oil, 419 U.S. at 195)); see also Gulf Oil, 419 U.S. at 195 ("[T]he distinct 'in commerce' language of the Clayton and Robinson-Patman Act provisions with which we are concerned here appears to denote only persons or activities within the flow of interstate commerce -- the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer.").

For more than 175 years of Commerce Clause precedent, this much has been clear: "Within the flow of commerce" denotes movement or people or things across interstate borders. See, e.g., Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 189-90, 6 L. Ed. 23 (1824) ("Commerce, undoubtedly, is traffic, but it is something more: it is intercourse."); Heart of Atlanta, 379 U.S. at 255-56 (noting that "intercourse" includes "the movement of persons through more States than one"); Champion v. Ames, 188 U.S. 321, 352, 23 S. Ct. 321, 47 L. Ed. 492 (1903) ("Commerce was defined in Gibbons v. Ogden to be 'intercourse,' and the thousands of people who daily pass and repass over this bridge may be as truly said to be engaged in commerce as if they were shipping cargoes of merchandise from New York to Liverpool." (citation omitted) (quoting Covington & Cincinnati Bridge Co. v. Kentucky, 154 U.S. 204, 218, 14 S. Ct. 1087, 38 L. Ed. 962 (1894)));

id. at 351 ("Commerce with foreign countries and among the states, strictly considered, consists in intercourse and traffic, including in these terms navigation and the transportation and transit of persons and property, as well as the purchase, sale, and exchange of commodities." (quoting County of Mobile v. Kimball, 102 U.S. 691, 702, 12 Otto 691, 26 L. Ed. 238 (1880))); Camps Newfound/Owatonna, Inc. v. Town of Harrison, 520 U.S. 564, 573, 117 S. Ct. 1590, 137 L. Ed. 2d 852 (1997) ("[T]he transportation of persons across state lines . . . has long been recognized as a form of 'commerce.'"). Accordingly, the jurisdictional language "in commerce" invokes Congress' authority to regulate only the channels within which people and goods move through the flow of commerce, as well as the instrumentalities used to facilitate that movement -- that is, the Lopez 1 and Lopez 2 powers. A statute that uses only the "in commerce" language stops well short of invoking Congress' Lopez 3 power to regulate activities outside the channels and instrumentalities of commerce that nonetheless substantially "affect" commerce.

Recognizing the importance of preserving easy linguistic tools by which Congress can articulate just how much of its commerce power it may choose to exert in a particular statutory enactment, the Supreme Court has been unwavering in its interpretation of these commerce-modifying terms. See, e.g., Am. Building Maintenance, 422 U.S. at 280 ("[T]he Court ha[s] drawn a sharp distinction

28

between activities in the flow of interstate commerce and intrastate activities that affect interstate commerce."). Their meanings are well settled, and the Court consistently declines to alter them. See, e.g., Circuit City Stores, 532 U.S. at 117 ("The Court's reluctance to accept contentions that Congress used the words [in a manner inconsistent with their standard meanings] rests on sound foundation, as it affords objective and consistent significance to the meaning of the words Congress uses when it defines the reach of a statute."); Am. Building Maintenance, 422 U.S. at 280-81 (citing the NLRA and the Bituminous Coal Act of 1937 as examples of Congress' use of "affecting commerce," and the 1950 amendment to section 7 of the Clayton Act as an example of a decision by Congress to "retain[] the narrower 'in commerce' formulation").

In fact, the Supreme Court has rejected the suggestion that "in commerce" and "affecting commerce" may be conflated or read interchangeably: "The contention that 'in commerce' should be read as if it meant 'affecting interstate commerce' was emphatically rejected [by the Court in FTC v. Bunte Bros., 312 U.S. 349, 61 S. Ct. 580, 85 L. Ed. 881 (1941)]." Am. Building Maintenance, 422 U.S. at 276. So "far-reaching" an application of the statute in question, the Court said, "ought to await a clearer mandate from Congress." Id. at 277. The Bunte Bros. decision "stressed the distinction between unfair methods of competition 'in

29

commerce' and those that 'affected commerce,' in limiting the scope of the [FTC's] authority under the 'in commerce' language."  Id. at 280.

In Scarborough v. United States, 431 U.S. 563, 97 S. Ct. 1963, 52 L. Ed. 2d 582 (1977), the Court reiterated this point.  At issue in Scarborough was the meaning of Title 18 U.S.C. § 1202(a), which penalizes any felon "who receives, possesses, or transports in commerce or affecting commerce" a firearm.  § 1202(a) (emphasis added).  Again, the Court observed that "Congress is aware of the distinction between legislation limited to activities 'in commerce' and an assertion of its full Commerce Clause power so as to cover all activity substantially affecting interstate commerce."  Scarborough, 431 U.S. at 571 (citation and internal quotation marks omitted).  Thus, the Court found it "apparent that . . . by prohibiting both possessions in commerce and those affecting commerce, Congress must have meant more than to outlaw simply those possessions that occur in commerce or in interstate facilities."  Id. at 572.

The Supreme Court similarly declined to conflate the phrase "used in" with "affect" in Jones v. United States, a case interpreting the federal arson statute, § 844(i).  In Jones, the Court assigned great significance to the particular commerce-modifying language selected by Congress, observing that "Congress did not define the crime described in § 844(i) as the explosion of a building whose damage or

30

destruction might <u>affect</u> interstate commerce," but rather "require[d] that the damaged or destroyed property must itself have been <u>used in</u> commerce or in an activity affecting commerce."  <u>Jones</u>, 529 U.S. at 854 (alteration in original) (emphasis added) (quoting <u>United States v. Mennuti</u>, 639 F.2d 107, 110 (2d Cir. 1981).  The Court refused to read § 844(i) so that "the statute's limiting language, 'used in' any commerce-affecting activity, would have no office," noting that "[j]udges should hesitate . . . to treat statutory terms in any setting [as surplusage], and resistance should be heightened when the words describe an element of a criminal offense."  <u>Id.</u> at 857 (omission and second alteration in original) (quoting <u>Ratzlaf v. United States</u>, 510 U.S. 135, 140-41, 114 S. Ct. 655, 126 L. Ed. 2d 615 (1994)).

Even if we had any doubt whether Congress was using "in commerce" and "affects commerce" as terms of art in this case, looking to the pre-1996 version of § 247 would erase all uncertainty on this score.  Prior to its amendment in 1996, § 247 specifically prohibited the destruction of religious property when, in committing the offense, the defendant traveled in interstate commerce.  The pre-1996 statute provided in pertinent part:

> (a) Whoever in any of the circumstances referred to in subsection (b) of this section --
> (1) intentionally defaces, damages, or destroys any religious real property, because of the religious character of that property, or attempts to do so; or

. . . .
shall be punished as provided in subsection (c) of this section.

(b) The circumstances referred to in subsection (a) are that --
(1) in committing the offense, the defendant travels in interstate or foreign commerce, or uses a facility or instrumentality of interstate or foreign commerce in interstate or foreign commerce; and
(2) in the case of an offense under subsection (a)(1), the loss resulting from the defacement, damage, or destruction is more than $10,000.

Pub. L. No. 100-346, § 1, 102 Stat. 644 (1988).

In amending the statute eight years later, Congress simply substituted in the jurisdictional language "that the offense is in or affects interstate or foreign commerce" for the original jurisdictional language that "in committing the offense, the defendant travels in interstate or foreign commerce, or uses a facility or instrumentality of interstate or foreign commerce in interstate or foreign commerce." All that Congress did was (1) employ the shorthand "in commerce" rather than describing the substantive requirement of use of the channels or instrumentalities of commerce; and (2) expand the jurisdictional hook to cover offenses that "affect" commerce, thereby invoking for the first time all of its commerce power. As the House Report accompanying the bill explained, the purpose of revising the jurisdictional language was to "simplif[y] the interstate commerce requirement of the current law," H.R. Rep. No. 104-621, at 2, reprinted in 1996 U.S.C.C.A.N. 1082, 1083, whose "highly restrictive and duplicative

language" made it difficult to prosecute cases under § 247, id. at 4, reprinted in 1996 U.S.C.C.A.N. at 1085. Notably, the amendment left the definition of the offense itself alone, altering only the jurisdictional scope of the statute. In fact, the new language was specifically drafted to mirror the Supreme Court's articulation in Lopez of the nature and extent of the commerce power. See id. at 7, reprinted in 1996 U.S.C.C.A.N. at 1088 ("This Committee is aware of the Supreme Court's ruling in United States v. Lopez . . . . [The amended § 247], by contrast [to the statute struck down in Lopez], specifically limits its reach to conduct which can be shown to be in or to affect interstate commerce.").

Simply put, § 247 contains unambiguous jurisdictional language -- covering offenses in or affecting commerce -- that must be given its proper effect. In this important respect, § 247 differs significantly from the statute invalidated in Lopez, which did not contain any clarifying jurisdictional statement, see Lopez, 514 U.S. at 561, thus leaving substantial ambiguity about which type of commerce power Congress intended to exert, see id. at 559. Here, in sharp contrast, by using the phrase "in or affects commerce," Congress has clearly invoked Lopez category 3 -- its power to regulate activities that substantially affect interstate commerce -- as well as categories 1 and 2 -- its power to regulate the use of the channels and instrumentalities of interstate commerce. Ballinger plainly used both channels and

33

instrumentalities of commerce to facilitate his eleven-church arson spree; thus, he committed his offenses "in commerce" within the precise meaning of the statute. Any other reading would contravene more than a century of Commerce Clause precedent by failing to give the jurisdictional words expressly chosen by Congress in amending § 247 their long-settled meanings.

Indeed, Ballinger's interpretation of § 247 would read the "in commerce" language out of the statute altogether. The Appellant's circumscribed construction of § 247 as applying only when the ultimate destruction of the church itself happens in commerce (or affects commerce) effectively excises the "in commerce" basis for jurisdiction from the statute. In fact, the Appellant argued explicitly to the en banc Court that "§ 247 applies only to cases having a substantial effect on interstate commerce, and does not apply to situations where the offense was committed or facilitated through the instrumentalities of interstate commerce, or through interstate travel." Appellant's En Banc Br. at 20. Although the Appellant offered at oral argument several strained examples of offenses he believed would be "in commerce," his argument in his brief that § 247 applies "only to cases having a substantial effect on interstate commerce" suggests that even he believes his interpretation of "in commerce" to be virtually impossible to satisfy.

The Appellant's remarkably constricted reading of the "in commerce"

34

language effectively strips those words of any force at all. It is difficult to imagine a case that more classically depicts arson occurring in commerce than Ballinger's. If § 247's prohibition on destroying religious property in commerce does not reach Ballinger's four-state church-arson spree, there is implausibly little, if any, conduct it actually proscribes. To dream up an offense in which the final act of destruction actually occurs "in commerce" is difficult, if not impossible. Even if the perpetrator were to ignite a fire in Florida, for example, just over the Georgia state line, and wait for it to burn its way across the border to a nearby Georgia church, the offense, as the Appellant sees it, would still not be in commerce because the act of destruction, though set into motion in Florida, actually occurs in Georgia.

As this example illustrates, the Appellant's cramped reading of the offense as comprising only the ultimate destruction of the targeted property severs unnaturally the offender from the offense. Section 247's regulatory and punitive focus is clearly on the offender, providing that "Whoever . . . defaces, damages or destroys any religious real property . . . shall be punished," § 247(a) (emphasis added); nevertheless, the Appellant's reading accommodates only the offense. A more reasonable reading would acknowledge that the offense is more than the last step in a sequence of acts that add up to the statutorily prohibited conduct. Travel to the site of the fire and procurement of the materials for the specific purpose of

35

burning a church are necessary and indispensable steps in committing arson. When the arsonist takes these steps in interstate commerce, his offense falls within Congress' power to regulate the channels and instrumentalities of commerce under all but the most artificially constrained reading of "offense."

By discarding the "in commerce" basis for jurisdiction, Ballinger has essentially redrafted the statute to read something like this: "Whoever substantially affects interstate commerce by defacing, damaging, or destroying religious property . . . shall be punished." This reading ignores the fact that Congress explicitly, on the face of the statute, used a disjunctive "in or affects" commerce jurisdictional predicate. In addition to dispensing with the plain language of the statute, the Appellant's reading disregards the Supreme Court's repeated admonition that the terms "in commerce" and "affect commerce" must be given their separate and distinct meanings. Moreover, this effective rewriting of the statute strips Congress of its constitutional authority to regulate the channels and instrumentalities of commerce (Lopez 1 & 2), leaving it with only its less-well-defined power to regulate purely intrastate activities that may substantially "affect" commerce (Lopez 3).

In addition to eviscerating the statute substantively, reading out "in commerce" contravenes basic canons of statutory interpretation. For one, an

interpretation that fails to give any meaning at all to the statute's "in commerce" language violates "'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." TRW, Inc. v. Andrews, 534 U.S. 19, 31, 122 S. Ct. 441, 151 L. Ed. 2d 339 (2001) (quoting Duncan v. Walker, 533 U.S. 167, 174, 121 S. Ct. 2120, 150 L. Ed. 2d 251 (2001)); see also Leocal v. Ashcroft, No. 03-583, slip op. at 10 (S. Ct. Nov. 9, 2004) ("[W]e must give effect to every word of a statute wherever possible . . . ."); TRW, 534 U.S. at 31 ("We are 'reluctant to treat statutory terms as surplusage in any setting,' and we decline to do so here." (quoting Duncan, 533 U.S. at 174)); United States v. Meansche, 348 U.S. 528, 538-39, 75 S. Ct. 513, 99 L. Ed. 615 (1955) ("It is our duty 'to give effect, if possible, to every clause and word of a statute.'" (quoting Montclair v. Ramsdell, 107 U.S. 147, 152, 17 Otto 147, 2 S. Ct. 391, 27 L. Ed. 431 (1883))).

Ballinger does not contend that it is impossible to give effect to the "in commerce" language. Indeed, to give meaning to the phrase "in commerce" requires looking no further than the Supreme Court's repeated statement that those words refer to "persons or activities within the flow of interstate commerce." Allied-Bruce, 513 U.S. at 273 (quoting Am. Building Maintenance, 422 U.S. at

276 (quoting Gulf Oil, 419 U.S. at 195)).  Accordingly, the only way to read § 247 is as covering arsons that "affect commerce" and arsons that occur "within the flow of interstate commerce."  "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."  Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54, 112 S. Ct. 1146, 117 L. Ed. 2d 391 (1992).  Here, Congress said -- and plainly meant -- that arson is an offense that can not only affect commerce, but also actually occur in commerce.  Thus, we cannot, as Appellant would have us do, see Appellant's En Banc Br. at 20, simply dismiss the possibility that arson could ever occur "in commerce."

In addition, reading the linguistically rich term "in commerce" out of the statute violates the principle that statutory language must be read in the context of the purpose it was intended to serve.  Congress does not write statutes for the words -- it writes them for the meaning.  Accordingly, words must be read to have a purpose, and from their purpose they cannot be delinked.  The Supreme Court has explained: "As in all cases of statutory construction, our task is to interpret the words of these statutes in light of the purposes Congress sought to serve." Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 608, 99 S. Ct. 1905, 60 L. Ed. 2d 508 (1979) (emphasis added).  "[N]othing is better settled than that statutes should receive a sensible construction, such as will effectuate the

38

legislative intention, and, if possible, so as to avoid an unjust or absurd conclusion." In re Chapman, 166 U.S. 661, 667, 17 S. Ct. 677, 41 L. Ed. 1154 (1897). The Appellant, by rendering "in commerce" nothing more than empty words, has severed that phrase from its purpose, in contravention of the basic principle that the words of a statute are written to fill a purpose, not to fill a page.

The few examples the Appellant offered at oral argument of offenses that would be "in commerce" under his interpretation illustrate the anomalous results produced by his reading. For example, Ballinger argued that sending a bomb to a church by mail would place that offense in commerce, since the mail is an instrumentality of commerce; however, we see no principled reason why mailing a bomb should constitute destruction of a church in commerce, whereas intentionally using a car -- another instrumentality of commerce -- to cross an interstate border and deliver the bomb oneself would not.

Ballinger contends further that using a cellular telephone as a mechanism for detonating a bomb might place the resulting church destruction in commerce. This may well be true; however, we can divine no reason to conclude that using a cell phone to detonate the bomb directly would be enough, but using a cell phone to call a co-conspirator in another state for the express purpose of instructing him to detonate the bomb would not. The Appellant's effort to distinguish the two cases

on the ground that the actual destruction of the church occurs in commerce under the former circumstances but not under the latter is strained to the breaking point. Because this Court "need not and should not countenance" an interpretation of statutory language that "leads to 'absurd or futile results . . . "plainly at variance with the policy of the legislation as a whole,"'" Equal Employment Opportunity Comm'n v. Commercial Office Prods. Co., 486 U.S. 107, 120, 108 S. Ct. 1666, 100 L. Ed. 2d 96 (1988) (quoting United States v. Am. Trucking Ass'ns, Inc., 310 U.S. 534, 543, 60 S. Ct. 1059, 84 L. Ed. 1345 (1940) (quoting Ozawa v. United States, 260 U.S. 178, 194, 43 S. Ct. 65, 67 L. Ed. 199 (1922))); see also United States v. Turkette, 452 U.S. 576, 580, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981) ("[A]bsurd results are to be avoided."), we reject the Appellant's reading.[8]

---

[8]A further consequence of Ballinger's reading "in commerce" out of the statute is that it largely eviscerates the offense of attempt to deface, damage, or destroy religious property. By its express language, § 247 covers not only completed acts of defacement, damage, or destruction of property, but also "attempts to do so." § 247(a) ("Whoever . . . intentionally defaces, damages, or destroys any religious real property, because of the religious character of that property, or attempts to do so . . . shall be punished . . . ."). "To sustain a conviction for the crime of attempt, the government need only prove (1) that the defendant had the specific intent to engage in the criminal conduct for which he is charged and (2) that he took a substantial step toward commission of the offense." United States v. Murrell, 368 F.3d 1283, 1286 (11th Cir. 2004). A substantial step "must be more than remote preparation," and must be conduct "strongly corroborative of the firmness of the defendant's criminal intent." United States v. Mandujano, 449 F.2d 370, 377 (5th Cir. 1974).

Because Ballinger has effectively removed from § 247 the "in commerce" basis for jurisdiction, precious few attempt offenses other than those that "affect commerce" remain covered by the statute. Ballinger suggests that § 247 "only applies to situations where the prosecution demonstrates that the offense of destroying or damaging religious real property has a substantial impact on interstate or foreign commerce." Appellant's En Banc Br. at 43. Such an

effect, he asserts, can be demonstrated "<u>only</u> by virtue of the connection between the structure and interstate commerce. The offense cannot have any impact on commerce other than through the destroyed building itself . . . ." <u>Id.</u> at 45 (emphasis in original). Since the <u>completed offense</u> of arson can affect commerce only insofar as the destruction of the church building has an impact on commerce, it is virtually impossible to conjure up any instance in which a <u>failed attempt</u> to destroy a church would have any effect -- let alone a substantial effect -- on interstate commerce. Ballinger's brief itself notes that "Section 247 even covers attempted church arson, which would not even result in any damage to a piece of religious real property." Appellant's Panel Br. at 41. A mere attempt, by definition, could not destroy church property; thus, the Appellant's interpretation largely reads the attempt offense out of the statute.

This substantial evisceration of the attempt crime thwarts Congress' effort to reach with § 247 not only the culminating act of actually destroying a church, but also substantial preparatory steps dangerously close to completing the offense, even when they ultimately miss their mark. The Appellant's suggestion that "the 'offense' must be measured <u>solely by looking at the impact on the building</u> or a religious icon," Appellant's <u>En Banc</u> Br. at 52 (emphasis added), is wholly incongruous with this effort. Furthermore, effectively stripping away the attempt language violates the basic and much-repeated principle that a statute must be construed so that no sentence, phrase, or word is rendered superfluous, void, or insignificant.

Moreover, reading § 247's attempt language, as the elements of attempt suggest it should be read, to cover those cases in which a "substantial step" toward destroying a church happens "in commerce" only magnifies the difficulty inherent in Appellant's interpretation. It would make little sense to conclude that when an arsonist takes a substantial preparatory step in commerce, the government can prosecute him for an attempt to destroy a church if his efforts fail, but not for the completed offense of church destruction should his attempt succeed. Thus, for example, travel in interstate commerce to the site of a target church, with the intent to burn that church, would constitute a substantial step in commerce; thus, if the would-be arsonist then sets a bomb that malfunctions and fails to detonate, he presumably could be prosecuted for his attempt to destroy the church. However, if the bomb detonates as intended and actually destroys the church, the arsonist could not be prosecuted because, under the Appellant's interpretation, the ultimate act of destruction must occur in commerce -- travel in interstate commerce to commit the offense is not enough to create jurisdiction over the completed offense.

This result is so remote that the doctrine of legal impossibility would likely bar the attempt prosecutions anyway. "Legal impossibility," we have explained, "occurs when the actions which the defendant performs or sets in motion, even if fully carried out as he desires, would not constitute a crime." <u>United States v. Oviedo</u>, 525 F.2d 881, 883 (5th Cir. 1976). The traditional view is that legal impossibility is a defense to the charge of attempt -- that is, if the completed offense would not be a crime, neither is a prosecution for attempt permitted. <u>See, e.g.</u>, <u>id.</u>; <u>see also</u> Jeffrey F. Ghent, Annotation, <u>Impossibility of Consummation of Substantive Crime as Defense in Criminal Prosecution for Conspiracy or Attempt to Commit Crime</u>, 37 A.L.R. 3d 375, §§ 2, 3 (2004). Quite simply, excising § 247's "in commerce" language not only

B.

The anomalous results produced by the Appellant's strained reading of § 247 also plainly defeat the statute's clear purpose. Ballinger suggests that § 247's legislative history "is not relevant" because the statutory language is unambiguous. Appellant's En Banc Br. at 35. We agree that the statute is unambiguous, making resort to legislative history unnecessary. Indeed, we mention the legislative history only insofar as Ballinger suggests that there may be some ambiguity in the jurisdictional scope of § 247, and in response to Ballinger's argument that the purpose of the 1996 amendment to § 247 was to contract the statute's jurisdiction. See id. at 30-32; 35; 41.

Section 247 was amended in 1996 in response to a national epidemic of burnings of predominantly African-American churches, particularly in the southeastern United States. H.R. Rep. No. 104-621, at 2-4 (1996), reprinted in 1996 U.S.C.C.A.N. 1082, 1083-85; 142 Cong. Rec. S7908-4, S7908 (1996) (joint statement of Sens. Faircloth and Kennedy and Reps. Hyde and Conyers). The statute's original jurisdictional language, Congress found, was too complex and too restrictive to facilitate prosecutions of these offenses. See id. In fact, only one prosecution had been brought under § 247 since its enactment in 1988. See H.R.

_____

eviscerates half of the statute's express jurisdictional basis, but also severely undercuts its explicit proscription of "attempts" to destroy religious property.

42

Rep. No. 104-621, at 4, <u>reprinted in</u> 1996 U.S.C.C.A.N. at 1095.  As we have noted, the pre-1996 version of the statute allowed prosecution for intentional defacement, damage, or destruction of religious property when: "(1) in committing the offense, the defendant travels in interstate or foreign commerce, or uses a facility or instrumentality of interstate or foreign commerce in interstate or foreign commerce; and (2) . . . the loss resulting from the defacement, damage, or destruction is more than $10,000."  Pub. L. No. 100-346, § 1, 102 Stat. 644 (1988). The 1996 amendment to the statute removed both the $10,000 monetary loss requirement <u>and</u> the requirement of interstate travel or use of a facility or instrumentality of commerce, extending jurisdiction to all cases in which "the offense is in or affects interstate or foreign commerce."  § 247(b).

Ballinger says that the removal of the language specifically prohibiting the destruction of religious property when, in committing the offense, the defendant traveled in interstate commerce means that travel in commerce is no longer enough to establish jurisdiction.  Appellant's <u>En Banc</u> Br. at 35.  However, the 1996 amendment removed interstate travel only as a jurisdictional <u>requisite</u>, not as a jurisdictional <u>ground</u>.

The plain and literally expressed purpose of this revision was to extend the reach of the statute.  As the House Report accompanying the bill explains,

Congress envisioned that "it would no longer be necessary to establish as a jurisdictional prerequisite that the defendant himself moved in interstate commerce or used a facility in interstate commerce. Instead it would be enough to show that his conduct had an impact on interstate commerce." H.R. Rep. No. 104-621, at 10 (1996), reprinted in 1996 U.S.C.C.A.N. at 1091. The statute was therefore amended in order to "broaden[] the jurisdictional scope of the statute by applying criminal penalties if the offense 'is in or affects interstate or foreign commerce.' This formulation grants Federal jurisdiction, and thus extends the Attorney General's ability to prosecute cases, as to any conduct which falls within the interstate commerce clause of the Constitution." Id. at 1087-88; see also 142 Cong. Rec. at S7909 (joint statement of Sens. Faircloth and Kennedy and Reps. Hyde and Conyers) ("The bill replaces subsection (b) with a new interstate commerce requirement, which broadens the scope of the statute by applying criminal penalties if the 'offense is in or affects interstate or foreign commerce.'" (emphasis added)).

Moreover, Congress specifically intended the amended § 247 to reach offenses like Ballinger's. The House and Senate reports both state that "[u]nder this new formulation of the interstate commerce requirement, the Committee intends that where in committing, planning, or preparing to commit the offense, the

44

defendant either travels in interstate or foreign commerce, or uses the mail or any facility of interstate or foreign commerce, the statute will be satisfied." H.R. Rep. No. 104-621, at 7 (1996), reprinted in 1996 U.S.C.C.A.N. at 1088; 142 Cong. Rec. at S7909 (joint statement of Sens. Faircloth and Kennedy and Reps. Hyde and Conyers).

Congress could not have made clearer its intention to exercise its full commerce power: the House Report specifically stated that § 247's "in or affects interstate or foreign commerce" language "grants Federal jurisdiction . . . as to any conduct which falls within the interstate commerce clause of the Constitution." H.R. Rep. No. 104-621, at 7, reprinted in 1996 U.S.C.C.A.N. at 1088 (emphasis added). The Senate Report reiterated that "it is the intent of the Congress to exercise the fullest reach of the Federal commerce power." 142 Cong. Rec. at S7909 (joint statement of Sens. Faircloth and Kennedy and Reps. Hyde and Conyers). Plainly, the statute is designed to cover all proscribed conduct that Congress may constitutionally reach. This is nothing more than the simple principle that the greater includes the lesser. Applying this general rule to the statute at hand leads inescapably to the conclusion that Ballinger has improperly read the statute as excluding his conduct: Congress invoked its full commerce power with the "in or affects commerce" language; Congress has the power, under

the Commerce Clause, to reach conduct like Ballinger's; therefore, the statute covers Ballinger's offenses.

## C.

A final, and to our thinking significant problem with Ballinger's reading of § 247 is that it is wholly inconsistent with the Supreme Court's -- and this Circuit's -- interpretation of the linguistically similar federal felon-in-possession statute.  As we have noted, in Scarborough v. United States, the Supreme Court interpreted the meaning of 18 U.S.C. § 1202(a), which punishes certain individuals who "receive[], possess[], or transport[] in commerce or affecting commerce" any firearm.  Observing that this provision could be read to require either that the act of possession itself occur in commerce or simply that the firearm have moved in commerce prior to an intrastate act of possession, the Court deemed the statutory language "ambiguous at best."  Scarborough, 431 U.S. at 570.  Significantly, the Court noted that, although Congress did not choose language that explicitly indicated that the offense of possession need not have "a present nexus with commerce," neither did the language indicate that a contemporaneous connection with commerce was required.  Id.

Thus, the Supreme Court did two things.  First, it stressed the need to give meaning to both the "in commerce" and the "affecting commerce" language.  See

46

id. at 571. Reviewing the congressional findings accompanying the legislation, the Court concluded that "it does seem apparent that in implementing these findings by prohibiting both possessions in commerce and those affecting commerce, Congress must have meant more than to outlaw simply those possessions that occur in commerce or in interstate facilities." Id. at 572.

Second, the Court looked to the legislative history, concluding that it "further supports the view that Congress sought to rule broadly to keep guns out of the hands of" felons and others. Id. The legislative history contained "no indication that Congress intended to require any more than the minimal nexus that the firearm ha[s] been, at some time, in interstate commerce." Id. at 575. Moreover, the Court noted that interpreting the statute as requiring the offense of possession itself to occur in commerce "fails completely to fulfill the congressional purpose" and "virtually eliminates the one offense on which Congress focused in enacting the law." Id. at 577. Accordingly, the Court rejected that view.

In interpreting § 247, we need look no farther than the methodology employed by the Supreme Court in Scarborough to reach the conclusion that § 247 cannot be interpreted as requiring the ultimate act of destruction to occur in commerce. Both the well-settled meaning of the statute's "in or affects" commerce language and the unambiguously expressed legislative intent lead us to the view

47

that travel in interstate commerce just prior to and for the purpose of destroying a church places the offense within the reach of § 247. To avoid -- as the Court sought to do in Scarborough -- stripping statutory language of meaning and thwarting legislative purpose, this Court must read § 247 to cover offenses like Ballinger's.

Ballinger concedes, as he must, that the words of the felon-in-possession statute are strikingly similar to the language employed in § 247. Nevertheless, he argues that the felon-in-possession statute should be interpreted differently because it is part of an overarching congressional scheme of gun regulation. This argument hardly begins to explain why the language of a church arson statute is entitled to less deference than the language of a gun statute. Moreover, Ballinger misses the point that the similarity between the statutes lies not in the subject of their regulation but in the linguistic tools used to invoke federal commerce jurisdiction. Textually, the language of the two statutes is so similar that the method and reasoning the Supreme Court applied in interpreting the language of the felon-in-possession law offer an easy and practical approach to the linguistically parallel arson statute.

Indeed, since Scarborough was decided, we have at least six times reaffirmed and reapplied its holding. We initially adopted the reasoning of

48

Scarborough in United States v. Standridge, 810 F.2d 1034 (11th Cir. 1987). In 1996, we reconsidered that decision in light of Lopez. In United States v. McAllister, 77 F.3d 387 (11th Cir. 1996), we addressed the meaning of Title 18 U.S.C. § 922(g), the successor statute to § 1202(a), which was at issue in Scarborough. Section 922(g) makes it unlawful for felons and certain other individuals "to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition." § 922(g)(1) (emphasis added). We declared that the fact that "the firearm possessed by McAllister previously had travelled in interstate commerce" satisfied the requirement that it be possessed in commerce. McAllister, 77 F.3d at 390.

In spite of the statute's literal language that the offender must "possess in commerce" the firearm, in United States v. Reynolds, 215 F.3d 1210 (11th Cir. 2000), we again reiterated that § 922(g)'s jurisdictional requirement means that the government must prove only "that the firearm possessed traveled in interstate commerce," -- not that the possession itself have occurred in commerce. Id. at 1215. Accordingly, Reynolds found the fact that the gun "was manufactured in Connecticut and then traveled across state lines to Florida, where Reynolds possessed it" was "sufficient to show the required nexus to interstate commerce." Id.

49

In 2001, this Court once more revisited the jurisdictional element of the felon-in-possession statute, this time in light of the Supreme Court's decision in Morrison. In United States v. Dupree, 258 F.3d 1258 (11th Cir. 2001), we held that "Morrison does not change the holding in McAllister and that § 922(g) is a constitutional exercise of Congress's commerce power." Id. at 1259. We determined that "by brandishing a firearm that was manufactured in California and found in his car, [the defendant's] actions satisfy [the jurisdictional requirement]." Id. at 1260. A panel of the Court echoed the holding once more in United States v. Scott, 263 F.3d 1270 (11th Cir. 2001), noting that nothing in Morrison or in Jones v. United States (which held that the federal arson statute, 18 U.S.C. § 844(i), did not reach a private residence), altered the holding in McAllister. See Scott, 263 F.3d at 1274. Thus, the fact that the "pistol that Scott possessed was manufactured in California and had moved in interstate commerce to Georgia where Scott was caught with the weapon" was "sufficient to demonstrate the required nexus to interstate commerce." Id.; see also United States v. Clay, 355 F.3d 1281, 1287 (11th Cir. 2004) (holding that § 922(g)'s "possess in or affecting commerce" language covered an offense in which the only evidence of a nexus between the weapon and commerce was an inscription on the barrel reading, "Colt Manufacturing Company, Hartford, Ct.," since the jury could "rationally infer[]"

50

from the inscription, coupled with the fact that the gun was seized in Georgia, that the weapon had "traveled in or at least affected interstate commerce"). The "possess in or affecting commerce" language of § 922(g) -- just like the "offense is in or affects commerce" language found in § 247 -- "is a jurisdictional element of that criminal offense." Clay, 355 F.3d at 1286.

Simply put, the Appellant's cramped construction of the jurisdictional language employed by Congress in § 247 is wholly at odds with the approach this Circuit has repeatedly taken to the nearly identical language found in § 922(g). In short, we read § 247 as requiring that the offender utilize the channels or instrumentalities of interstate commerce in carrying out his crime -- not that the ultimate actus reus of destroying the church itself somehow occur in commerce.

IV.

The nature and history of the commerce power, the plain language of § 247, and the long-accepted meaning of the term "in commerce," along with the accompanying legislative history and the interpretation of the linguistically similar felon-in-possession statute, all yield the conclusion that Congress did, in fact, proscribe Ballinger's conduct, and that it had the power to do so. Accordingly, we affirm Ballinger's convictions.

AFFIRMED.

EDMONDSON, Chief Judge, concurs in the result.

TJOFLAT, Circuit Judge, dissenting, in which BIRCH and HILL, Circuit Judges, join:

The court holds that 18 U.S.C. § 247, which provides that "[w]hoever . . . intentionally defaces, damages, or destroys any religious real property, because of the religious character of that property, or attempts to do so . . . shall be punished" if "the offense is in or affects interstate or foreign commerce," reaches a purely local church arson so long as the arsonist crossed state lines prior to the offense. In other words, the earlier travel places the offense itself "in . . . interstate . . . commerce." Because I believe that a church arson is not "in commerce" simply because the offender traveled from another state sometime prior to the offense and, moreover, that so interpreted the statute exceeds Congress's authority under the Commerce Clause, I respectfully dissent. I agree with much of what is said in the dissents Judges Hill and Birch have filed and write separately only to emphasize a few points.

I

When Congress seeks to rely on interstate travel as a basis for exercising its authority under the Commerce Clause, it knows how to do so. As the panel majority noted, "[t]here are numerous federal statutes which do, explicitly, forbid movement in interstate commerce in order to commit a traditional common-law crime." United States v. Ballinger, 312 F.3d 1264, 1273 n.8 (11th Cir. 2002)

53

(collecting statutes).  And more important for present purposes, prior to its amendment in 1996, § 247 itself reached cases in which, "in committing the offense, the defendant travels in interstate or foreign commerce, or uses a facility or instrumentality of interstate or foreign commerce in interstate or foreign commerce."  In 1996, this provision was deleted and replaced with the current § 247(b), which extends only to cases in which "the offense is in or affects interstate or foreign commerce."

The court, however, now reads the old interstate travel provision back into the statute, as if the 1996 amendment had never occurred, despite the fact that it is unable to cite a single case that holds that an offense is "in commerce" simply because the offender crossed state lines at some point prior to its commission.  In reaching this conclusion, the court makes much of the narrowness of the contrary interpretation urged by the appellant and relies on the principle that, whenever possible, a statute should be read in a way that gives effect to all of its words.  Indeed, the court faults the appellant for failing to identify satisfactorily those offenses other than his own that might be considered "in commerce."  <u>Ante</u>, at 22.  I am uncertain what, if any, church arson might be "in commerce."  It is, however, clear to me that a church arson is not "in commerce" simply because the arsonist came from another state at some point prior to the offense.  The rule that statutes

54

should be read so as not to render words insignificant is a general principle of statutory interpretation, not an inflexible rule.[1]  Therefore, we need not do violence to the statutory language simply to satisfy ourselves that we have given all the words of § 247 a function.  The court says that "Congress does not write statutes for the words—it writes them for the meaning."  Ante, at 38.  The court, in turn, has applied § 247's (perceived) meaning rather than its words.

## II

I agree fully with the court that the "congressional power to regulate the channels and instrumentalities of commerce includes the power to prohibit their use for harmful purposes, even if the targeted harm occurs outside the flow of commerce and is purely local in nature."  Ante, at 12.  That congressional power, however, is not implicated by this case.  Rather, the court has interpreted § 247 to reach a crime that is purely local in nature simply because the defendant crossed state lines prior to its commission.  Thus, what the court interprets the statute to regulate is the purely local intrastate crime, not the use of the channels and instrumentalities of commerce for a harmful purpose.

In its opinion, the court cites a number of federal criminal statutes that

---

[1] The court itself quotes cases stating that every word should be given effect "if possible" or "wherever possible" or that the Supreme Court was "reluctant to treat statutory terms as surplusage."  Ante, at 37.

criminalize interstate travel for illicit purposes, as well as several early Supreme

Court cases upholding such statutes.  Ante, at 19-20 & n.6.  Those statutes,

however, are unlike § 247 because they do in fact regulate the channels and

instrumentalities of commerce.[2]  Under such statutes, the offender commits a crime

[2] In note 7 of the opinion, the court contends that 18 U.S.C. § 2118(a) is like § 247.
Section 2118(a) provides:

> Whoever takes or attempts to take from the person or presence of another by force
> or violence or by intimidation any material or compound containing any quantity
> of a controlled substance belonging to or in the care, custody, control, or
> possession of a person registered with the Drug Enforcement Administration
> under section 302 of the Controlled Substances Act (21 U.S.C. 822) shall . . . be
> fined under this title or imprisoned not more than twenty years, or both, if (1) the
> replacement cost of the material or compound to the registrant was not less than
> $500, (2) the person who engaged in such taking or attempted such taking
> traveled in interstate or foreign commerce or used any facility in interstate or
> foreign commerce to facilitate such taking or attempt, or (3) another person was
> killed or suffered significant bodily injury as a result of such taking or attempt.

This statute is valid, however, not because of the interstate travel provision, but rather because it
"form[s] an essential part of a larger regulation of economic activity, namely the manufacture,
distribution and possession of controlled substances, in which the overall regulatory scheme
could be undercut unless the intrastate activity were regulated."  United States v. Workman, 990
F. Supp. 473, 475 (S.D. W. Va. 1998) (upholding § 2118(b), which criminalizes entering or
attempting to enter the premises or property of a person registered with the DEA with the intent
to steal a controlled substance).  Moreover, the statute itself indicates that the interstate travel
provision is not relied upon to establish jurisdiction under the Commerce Clause, for even where
no interstate travel is involved the statute reaches cases in which the controlled substance taken
was worth at least $500 or another person was killed or seriously injured in the course of the
crime.

Similarly, the other two statutes discussed in note 7 of the court's opinion, 21 U.S.C. §
331(k), which criminalizes the adulteration or misbranding of any article subject to FDA
regulation "while such article is held for sale . . . after shipment in interstate commerce," and the
old felon-in-possession statute addressed in Scarborough v. United States, 431 U.S. 563, 97 S.
Ct. 1963, 52 L. Ed. 2d 582 (1977), which made it a crime for a felon to "possess[] or transport[]
in commerce or affecting commerce, . . . any firearm," are within Congress's commerce power
because they are part of a larger regulation of economic activity, namely, the regulation of drugs,
etc., in one case, and the regulation of guns, etc., in the other.  See United States v. Sullivan, 332
U.S. 689, 68 S. Ct. 331, 92 L. Ed. 297 (1948) (upholding the FDA provision as a valid exercise
of "the constitutional power of Congress under the commerce clause to regulate the branding of
articles that have completed an interstate shipment and are being held for future sales in purely

as soon as he begins travel in interstate commerce for the harmful purpose because that is precisely what is made criminal—the movement in commerce for the harmful purpose. In those cases, the use of the channels of commerce and the offense itself are inextricably intertwined, and Congress has properly regulated the channels and instrumentalities of interstate commerce. Here, in contrast, there is no suggestion that § 247 criminalizes mere travel with the unlawful purpose or regulates, for example, the interstate transportation of persons for the purpose of committing church arson. Rather, the statute unambiguously regulates the purely local defacement or destruction of religious real property itself. This distinction does not, as the court contends, "conflate[] the constitutional question with the statutory interpretation question." Ante, at 20. Indeed, the Supreme Court acknowledged this very difference in Caminetti v. United States, 242 U.S. 470, 37 S. Ct. 192, 61 L. Ed. 442 (1917):

> It may be conceded, for the purpose of the argument, that Congress has no power to punish one who travels in interstate commerce merely because he has the intention of committing an illegal or immoral act at the conclusion of the journey. But this act is not concerned with such

local or intrastate commerce" (citing, inter alia, Wickard v. Filburn, 317 U.S. 111, 63 S. Ct. 82, 87 L. Ed. 122 (1942))); Scarborough, 431 U.S. at 576, 97 S. Ct. at 1969 (1977) (reasoning that a narrower interpretation of "in commerce or affecting commerce" would "create serious loopholes in the congressional plan"). Thus, the court's reliance on Scarborough and progeny is misplaced, as Congress's authority to regulate the possession of guns is part of its larger authority to regulate the sale, distribution, and possession of guns—an economic activity—and the statute refers not only to possession "in commerce," but also to possession "affecting commerce."

57

> instances. It seeks to reach and punish the movement in interstate commerce of women and girls with a view to the accomplishment of the unlawful purposes prohibited.

Id. at 491, 37 S. Ct. at 197. This statement, which only assumes the point for the sake of argument, does not, of course, conclusively establish that the court's interpretation of § 247 is beyond Congress's commerce power. But it does demonstrate that there is a difference between this case and the cases on which the court relies and, further, that the constitutional issue cannot be resolved simply by way of citations to those cases. And once it is seen that this case is not controlled by those precedents, it also becomes clear that the court's interpretation of § 247 is unconstitutional under United States v. Lopez, 514 U.S. 549, 115 S. Ct. 1624, 131 L. Ed. 2d 626 (1995). Because the court's reading of § 247 regulates a purely local crime rather than the use of the channels or instrumentalities of commerce, it cannot be sustained as an exercise of Congress's "Lopez 1" or "Lopez 2" powers. Nor, as the panel majority in this case has already demonstrated, can it be sustained under "Lopez 3." Ballinger, 312 F.3d at 1268-76.

## III

My final quarrel with the majority opinion is that its ultimate holding is obscure. As I have explained, I do not understand the court's decision to hinge on a determination that Ballinger actually crossed state lines with the intent to burn

58

churches; rather, I take the court to hold that § 247 reaches Ballinger's conduct simply because he crossed state lines at some point not too long before committing the arson. If this is truly the holding of this case, then the obvious follow-up question is how closely connected the border crossing and the arson must be for § 247 to apply. Ballinger, of course, began burning churches in Georgia soon after arriving there, so this is, for the court, an easy case. But would § 247 still apply if he had waited a week? What about a month? Or what if Ballinger had actually moved to Georgia, established a permanent residence, and then several months or even years later committed the arson? I think it is likely that the court would draw a line somewhere along this continuum, but I am not at all sure where it would be. Nor can I imagine from whence such a rule would come, other than maybe our own good judgment. Since there is no basis in the text of the statute itself for such a rule, it—like the court's interstate travel jurisdictional hook—would have to be created out of whole cloth. If this is what the court means to hold, it would be better to say so clearly and to go ahead and write the rule into the statute now so as to at least give the district courts and the Government some guidance going forward. Instead, the court vaguely holds that § 247 applies whenever the arsonist crosses state lines at some point prior to the offense. How close in time the border crossing and the arson must be is a question that we apparently leave for another

day.  Thus, although the court is willing to hold that § 247 contains a jurisdictional

hook that, on its face, it quite plainly does not, it is unwilling to say exactly what

that jurisdictional hook is.

It is possible, however, that I have misread the court's opinion.  At the outset

of the opinion, for example, the court does state that Ballinger "cross[ed] the

borders of four states for the purpose of burning churches."  Ante, at 2.  And later

on, the court states that Ballinger made "at least six separate border crossings, all

for the specific purpose of spreading the evil of church burning through four

different states," and, quoting the panel dissent, that "the immediacy with which he

set out to burn churches once he arrived and the absence of any indication that he

had other business in Georgia demonstrate that he used the channels for the

purpose of committing arson."  Ante, at 17-18 (quoting Ballinger, 312 F.3d at 1278

(Hall, J., dissenting)).

Does this mean that the court does, in fact, hold that § 247 applies only when

the defendant actually traveled in interstate commerce with the intent to commit

church arson—i.e., that mere proof of travel and a subsequent arson is insufficient?

If so, then I think that the court has two problems.  First, there is again nothing in

the text of the statute to support such a reading.  Of course, a lack of textual

support will plague any interpretation of § 247 that reaches Ballinger's conduct, so

60

I will move on to the second problem with this potential holding: neither the facts charged in the indictment nor those to which Ballinger stipulated as part of his plea agreement support a finding that he actually crossed state lines with the intent to burn churches. The indictment merely tracks the statutory language, charging that the arson was committed "under circumstances such that [it] was in and affecting interstate commerce." Moreover, Ballinger stipulated that he and his girlfriend left Indiana "partly out of concern about a call by an FBI agent to Ballinger's parent's home in Indiana." He also stipulated that he did not purchase the gasoline used in the Georgia fires until he was actually in Georgia. Nowhere does he specifically admit that he crossed state lines with the intent to burn churches or traveled for that specific purpose. Thus, if the court has in fact rewritten § 247 to make interstate travel with the intent to commit church arson an element of the offense, then the conviction should be vacated because there is no evidence in the record of such an intent. See, e.g., United States v. Gamboa, 166 F.3d 1327, 1331 n.4 (11th Cir. 1999) ("A court cannot accept a guilty plea unless it is satisfied that the conduct to which the defendant admits constitutes the offense charged."); United States v. White, 258 F.3d 374, 380 (5th Cir. 2001) ("notwithstanding an unconditional plea of guilty, we will reverse on direct appeal where the factual basis for the plea as

shown of record fails to establish an element of the offense of conviction").[3]

To reiterate, I do not think this shortcoming really matters to the court's holding, as I understand the holding to be that the crime is the church arson and that the prior border crossing is a sufficient jurisdictional hook whether intent was present during that interstate travel or not. Indeed, the very fact that the court has rendered this point a nonissue underscores the difference between federal statutes that criminalize interstate travel for an illicit purpose and the statute we address

---

[3] On appeal, Ballinger does not specifically argue that his conviction should be vacated on this ground. This is understandable. In the part of its opinion holding that the charged offenses "occurred in interstate commerce," the district court stated the following:

> [D]efendant traveled through Indiana, Kentucky, and Tennessee on his way to Georgia and then back through Kentucky thereafter. Defendant utilized interstate highways, gas stations, hotels, and supplies and made various purchases in interstate commerce to prepare for and accomplish a multi-state arson campaign that ultimately targeted eleven churches in four different states. Although defendant's crimes in Indiana, Kentucky, and Tennessee are not presently before this court, the stipulated factual basis illustrates that these transactionally-related offenses constitute part of a larger campaign which may be fairly characterized as an "offense . . . in or affect[ing] interstate or foreign commerce." 18 U.S.C. § 247(b). This court is satisfied that on these grounds alone, defendant's § 247 prosecution is constitutionally permissible.

The district court did not rest its determination that the offenses occurred "in commerce" on any determination that Ballinger actually entered Georgia with the intent of burning churches. Rather, the district court held that the border crossing by itself placed the subsequent offense "in commerce" without regard to intent. If the majority's interpretation of § 247 does, in fact, require a showing of such an intent—and, again, my impression is that it does not—then it differs significantly from the "in commerce" theory of the conviction the district court adopted. Cf. App.'s En Banc Brief, at 29 ("In its Petition for En Banc Consideration, the government contended that §247 is satisfied when a defendant travels across state lines at some unnamed point prior to committing the offense."), 34 ("The government never answers the question of . . . how far in time this line crossing would continue [to satisfy the requirement that the offense be 'in commerce']."). It is, therefore, of no moment that Ballinger has not specifically argued the point on appeal; if we are to create a new theory of the conviction on appeal, we must at least ascertain whether the factual basis for the guilty plea in fact supports that theory.

here. If § 247 actually targeted interstate travel with the intent to commit church arson, it would probably be constitutional, and we would have to decide whether the stipulated factual basis for the plea is sufficient to establish intent and thus to sustain the conviction. But such a reading of the statute would lack even the faintest basis in its text, and I do not think that it is the interpretation that the majority adopts. I mention the possibility only because the court's opinion is less than clear on this point, and if I am wrong and this is the court's interpretation of the statute, then the court should at least explain its basis for concluding that Ballinger actually crossed state lines with the intent to commit church arson.

My confusion as to the holding of this case can be summarized in a few short questions that the court seems to leave unanswered: First, under the court's interpretation of § 247, is it necessary to prove that the defendant traveled in interstate commerce with the intent to commit church arson? I think the court would answer, "no." If that is the case, then how close in time must the border crossing and the arson be for § 247 to apply? (And, as a matter of statutory interpretation, how are we to decide where to draw the line?) If, however, the court would answer my first question in the affirmative, what basis is there for concluding that Ballinger crossed state lines with the intent to commit church arson? Because all of these points remain unclear, the court's opinion remains

63

unsatisfactory even if I assume that it reaches the correct result. Once these ambiguities are cleared away, we are again left with purely intrastate offenses and a federal prosecution of them that hangs solely on the offender's earlier crossing from one state into another. As such, the court's discussion of Ballinger's highway travels, gasoline purchases, and hotel stays, and its citations to cases sustaining convictions where the federal crime was the interstate travel itself, are simply irrelevant and serve only to obscure the real issue and to create an illusion of a connection to interstate commerce that simply does not exist in fact.

IV

Because § 247 cannot properly be interpreted to reach Ballinger's conduct, and because it would be unconstitutional even if it could, I respectfully dissent.

BIRCH Circuit Judge, dissenting, in which HILL, Circuit Judge, joins:

As to the majority opinion, I respectfully dissent. I fully concur in Judge Hill's dissent and add my following thoughts as well.

At its core, this case devolves into a simple, yet nuanced, question: does the Commerce Clause grant the United States Congress the power to proscribe the common law crime of arson by attaching the jurisdictional qualifier "in or affects interstate commerce" to the anti-church-burning statute, 18 U.S.C. § 247? As Judge Hill's thorough and well-reasoned dissent points out, the majority's noble effort to uphold the constitutionality of § 247 through statutory construction fails to consider what the statute actually penalizes, namely, a local common law crime against property.[1] While I fully concur with his opinion and analysis, Judge Hill's arguments can be magnified even further when viewed through the lens of federalism, a concept which retains vitality and importance in our modern constitutional scheme, see United States v. Lopez, 514 U.S. 549, 575, 115 S. Ct. 1624, 1637 (1995). Recognizing that § 247 regulates by federal statute an area of criminal law traditionally reserved to the States, I write separately to emphasize

---

[1] As Judge Hill notes, § 247 cannot be construed to penalize interstate travel to accomplish an arson of religious real property because the proscription of such travel was excised by Congress in 1996 when it amended the statute. By deleting the reference to interstate travel and inserting the present language, Congress cast § 247's reach "over a wider, and more purely intrastate" category of common law crimes by outlawing the act of church-burning itself if accomplished after the arsonist happened to cross State lines. See United States v. Morrison, 529 U.S. 598, 613, 120 S. Ct. 1740, 1752 (2000).

that the principles of federalism implicated in this case should have led the majority to find that 18 U.S.C. § 247 represents an incursion into State police powers not sanctioned by the United States Constitution.

I. Federalism and Its Relation to Commerce Clause Interpretation

It is axiomatic that the "Constitution creates a Federal Government of enumerated powers." Lopez, 514 U.S. at 552, 115 S. Ct. at 1626. Despite the rise and fall of various constitutional doctrines, this bedrock principle has received enduring, unfailing adherence. See McCulloch v. Maryland, 17 U.S. 316, 405 (1819) (noting that it is "universally admitted" that the federal government is "one of enumerated powers"); Hammer v. Dagenhart, 247 U.S. 251, 275, 38 S. Ct. 529, 532 (1918) (same); United States v. Morrison, 529 U.S. 598, 607, 120 S. Ct. 1740, 1748 (2000). In accordance with this construct, "[e]very law enacted by Congress must be based on one or more of its powers enumerated in the Constitution." Morrison, 529 U.S. at 607, 120 S. Ct. at 1748. Concomitant with this recognition that federal legislative power is limited by the Constitution, however, is the principle that legislative power not granted to Congress was reserved to the States. See U.S. CONST. amend. X; United States v. Darby, 312 U.S. 100, 124, 61 S. Ct. 451, 462 (1941) (noting that the Tenth Amendment "states but a truism that all is retained which has not been surrendered"). The Framers thus established a

66

constitutional structure in which "[t]he powers delegated . . . to the federal government are few and defined[;] [t]hose which are to remain in the State governments are numerous and indefinite."  THE FEDERALIST No. 45 (James Madison).  Accordingly, the Constitution ensures "a system of dual sovereignty between the States and the Federal Government."  Gregory v. Ashcroft, 501 U.S. 452, 457, 111 S. Ct. 2395, 2399 (1991).  This complex constitutional dynamic is typically summarized by the single phrase "federalism."

Realizing that the constitutional design mandated adherence to federalist principles, federalism has informed jurisprudential analysis in a number of areas.  For example, federalism and respect for State sovereignty has led the Supreme Court to caution against granting federal injunctions to enjoin pending State court proceedings.  See Younger v. Harris, 401 U.S. 37, 45, 91 S. Ct. 746, 751 (1971).  Likewise, a concern for federalist principles has led federal courts to refrain from reversing a State court decision if that decision rests on adequate State grounds independent of federal questions.  See, e.g., Murdock v. City of Memphis, 87 U.S. 590, 635 (1875).  Similarly, respect for the legislative competence of States has dictated that federal courts sitting in diversity apply State rules of decision, see Erie R.R. v. Tompkins, 304 U.S. 64, 78, 58 S. Ct. 817, 822 (1938) (noting that "the Constitution of the United States . . . recognizes and preserves the autonomy and

independence of the States"), and State choice of law rules, see Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S. Ct. 1020, 1021 (1941).

It is against this backdrop of federalism that the Commerce Clause is most appropriately interpreted when a federal statute purports to regulate an area in which State law traditionally occupied the field. The Constitution grants Congress the power to "regulate Commerce with foreign Nations, and among the several States . . . ." U.S. CONST. art. I, § 8. This "express grant of power to regulate commerce among the States has always been understood as limited by its terms." United States v. Dewitt, 76 U.S. 41, 44 (1869); see Lopez, 514 U.S. at 553, 115 S. Ct. at 1627 (citing Gibbons v. Ogden, 22 U.S. 1 (1824) for the proposition that the "limitations on the commerce power are inherent in the very language of the Commerce Clause"). Thus, the Constitution relegates Congressional activity to areas of *interstate* commerce. The Framers chose to limit the exercise of federal power in this manner precisely to preserve a federalist system. See NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 37, 57 S. Ct. 615, 624 (1937) ("[T]he scope of this [Commerce Clause] power must be considered in the light of our dual system of government . . . ."). By restricting congressional activity to the regulation of interstate commerce, the Constitution preserves the "'distinction between what is national and what is local'" lest a "'completely centralized government'" wholly

occupy the legislative field.  Lopez, 514 U.S. at 557, 115 S. Ct. at 1629 (quoting

Jones & Laughlin Steel Corp., 301 U.S. at 37, 57 S. Ct. at 624).

Admittedly, however, some federal regulation in areas traditionally reserved

to the States is required.  Realizing that certain acts which are wholly intrastate in

character may affect interstate commerce, and thereby frustrate Congress's express

power to regulate interstate commerce, the Supreme Court has permitted federal

regulation of such activity where it *substantially* affects interstate commerce in the

*aggregate*.  See Wickard v. Filburn, 317 U.S. 111, 124-25, 63 S. Ct. 82, 89 (1942).

The Wickard decision, however, has been subsequently declared to be "perhaps the

most far reaching example of Commerce Clause authority over intrastate activity."

Lopez, 514 U.S. at 560, 115 S. Ct. at 1630.  Moreover, subsequent decisions

relying on Wickard have delimited its holding in two important and obvious ways

because of federalist concerns.  First, federal regulation of intrastate activity must

regulate activity that is *economic* in nature.  Morrison, 529 U.S. at 610, 120 S. Ct.

at 1750.[2]  This limitation recognizes that if the federal government is allowed to

_____

[2] Reading the cases in which federal regulations of intrastate activity have been upheld
under the Commerce Clause, this limitation could be refined even further to require that the
federal regulation *promote* the national economy, rather than simply affect it.  See United States
v. Wrightwood Dairy Co., 315 U.S. 110, 120, 62 S. Ct. 523, 526 (1942) (noting that the Sherman
Antitrust Act could be applied to intrastate activity because anti-monopolistic conditions
promoted interstate commerce); Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 258,
85 S. Ct. 348, 358 (1964) (finding regulation of motels was permitted under Commerce Clause
because it promoted interstate commerce by encouraging unrestricted interstate travel); Perez v.
United States, 402 U.S. 146, 154-55, 91 S. Ct. 1357, 1362-63 (1971) (upholding federal

encroach upon noneconomic areas of State concern, federal regulation will crowd

out state legislation in contravention to the Constitution's federalist dynamic.  See

Lopez, 514 U.S. at 595, 115 S. Ct. at 1647 (Thomas, J., concurring) (noting that the

power to regulate "intrastate *commerce*" which substantially affects interstate

commerce does not sanction federal regulation of intrastate "activities" unrelated to

commerce).  Second, federal enactments reaching intrastate commerce must have a

sufficient nexus to interstate activity.  Id. at 562-63; see Maryland v. Wirtz, 392

U.S. 183, 196, 88 S. Ct. 2017, 2024 (1968) ("The subject of federal power is still

'commerce,' and not all commerce but commerce . . . among the several States.")

(citation omitted).  The Court relegated Wickard's reach in this manner because, if

the federal government were allowed "to take over the regulation of entire areas of

traditional state concern, . . . the boundaries between the spheres of federal and

state authority would blur . . . ."  Lopez, 514 U.S. at 577, 115 S. Ct. at 1638

(Kennedy, J., concurring).  Accordingly, along the spectrum of Congress's

commerce power, Wickard and its progeny, tempered by federalist limitations,

represent the farthest federal regulation can reach into intrastate activity.  The

majority ignores this limitation.

II.  The Commerce Power and 18 U.S.C. § 247

criminalization of loan-sharking because such practices hindered legitimate national economic
activity).

70

Against this background of federalism and the boundaries it establishes for congressional activity in areas typically relegated to State law, the core issues in this case come into focus. As Judge Hill's dissent notes, 18 U.S.C. § 247 represents a federal statute which purports to proscribe the common law crime of arson when directed at religious real property by a perpetrator who crossed State lines to commit the crime. Viewing the commerce power in a federalist context, it becomes manifest that the power to proscribe church burning in this manner lies beyond Congress's grasp.

First, this regulation impermissibly intrudes into areas traditionally reserved to the States. "States possess primary authority for defining and enforcing the criminal law."[3] Brecht v. Abrahamson, 507 U.S. 619, 635, 113 S. Ct. 1710, 1720 (1993). That the legislative proscription of common law crimes should be left to the States was apparent to the Framers before the Constitution was ratified. See THE FEDERALIST, No.17 (Alexander Hamilton) (noting that the "administration of criminal and civil justice" was reserved to the States). This concept was confirmed

---

[3] Importantly, it should be noted that Congress is not barred from enacting criminal laws pursuant to its express powers. See Lopez, 514 U.S. at 597 n.6, 115 S. Ct. at 1648 n.6 (Thomas, J., concurring). Utilizing the Necessary and Proper Clause, see U.S. CONST. art. I, § 8, Congress has prohibited *movement* through interstate channels by criminal sanction. See, e.g., 18 U.S.C. § 1958 (criminalizing travel to commit murder for hire). When Congress criminalizes localized conduct traditionally regulated the States, however, federalism concerns are triggered and federal courts should invalidate the statute if it unduly obliterates the federal-State balance mandated by our constitutional design. See Lopez, 514 U.S. at 552, 115 S. Ct. at 1626.

71

by the Supreme Court, see Cohens v. Virginia, 19 U.S. 264, 428 (1821) ("It is clear, that Congress cannot punish felonies generally."), and it retains vitality today, see Morrison, 529 U.S. at 618, 120 S. Ct. at 1754 ("[W]e can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims."). In addition to encroaching into State criminal law, § 247 also relates to real property, another area traditionally reserved to the States. See Village of Euclid v. Amber Realty Co., 272 U.S. 365, 387-88, 47 S. Ct. 114, 118 (1926). By purporting to outlaw the act of burning a church, Congress has federalized a common law crime against property. See California v. Minjares, 443 U.S. 916, 927, 100 S. Ct. 9, 15 (1979) (Rehnquist, J., dissenting) (noting that "crimes against person and property—the traditional common-law crimes—have largely remained the preserve of the State."). Truly, church arson is contemptible behavior, and Ballinger's conduct merits harsh condemnation. His acts, however, devastated the worship spaces of local church communities; and by destroying local, fixed real property, the affects of his crimes are most closely felt by local citizens. Accordingly, the proper channel for expressing local outrage and exacting justice is the State criminal law[4] enacted by the representatives of the

---

[4] State criminal statutes would have outlawed Ballinger's conduct in each of the States in which he committed church arson. See IND. CODE ANN. § 35-43-1-1; KY. REV. STAT. ANN. §

affected local citizens.[5]  Because "Congress may not in the exercise of federal power exert authority wholly reserved to the States," Linder v. United States, 268 U.S. 5, 19, 45 S. Ct. 446, 449 (1925) (citation omitted), § 247 is an unconstitutional attempt by Congress to reach beyond its commerce power.  See Hammer, 247 U.S. at 273, 38 S. Ct. at 532 (finding unconstitutional a federal statute proscribing the trafficking of goods made with child labor because it infringed on State police power); Keller v. United States, 213 U.S. 138, 148, 29 S. Ct. 470, 473 (1909) (invalidating a federal statute criminalizing the importation of an alien for purposes of prostitution because "there is in the Constitution no grant to Congress of the police power"); see also Jones v. United States, 529 U.S. 848, 858, 120 S. Ct. 1904, 1912 (2000) (reading 18 U.S.C. § 844(i) narrowly to avoid

---

513.030; TENN. CODE ANN. § 39-14-301(b)(2)(A) (specifically proscribing "[a]rson of a place of worship"); O.C.G.A. § 16-7-61.

[5] In this way, the majority's insistence that the statute constitutionally prevents channels of interstate commerce from being used to accomplish injurious or harmful ends is misplaced. While Ballinger used interstate highways to travel to the States in which he burned churches, his crimes affected fixed real property and local citizens.  Accordingly, the channels of interstate commerce were rendered no less conducive to the facilitation of commerce simply because Ballinger used them prior to the commission of his crimes.  If Congress's commerce power were allowed to stretch so far, Congress could proscribe common law murder, an act which also has localized affects and sparks local outrage, if the perpetrator used a highway to arrive at the scene of the crime.  As the Supreme Court has noted, Congress lacks the power to proscribe common law murder.  See Cohens v. Virginia, 19 U.S. at 426 (stating that Congress has "no general right" to punish common law crimes like "murder committed within any of the States").  Accordingly, by analogy, Congress may not proscribe arson in § 247 under the guise of protecting a channel of interstate commerce when arson has localized affects and in no way impairs the conduct of commercial intercourse.

the constitutional issue of transforming all arson subject to state regulation into federal felonies).

Second, assuming arguendo that § 247 is in fact placed closer to the realm of permissible federal regulation of intrastate conduct recognized by Wickard and its progeny because it contains the jurisdictional qualifier "in or affects commerce,"[6] its lack of the requisite nexus to things economic shows that § 247 is beyond even the furthest reach of Congress's commerce power. In Lopez, the Court found that a federal statute regulating firearm possession in schools lacked any nexus to economic activity. See Lopez, 514 U.S. at 551, 115 S. Ct. at 1626. Similarly, only by the employment of several inferential conclusions can one connect the proscription in 18 U.S.C. § 247 to economic activity. See id. at 567 (refusing to "pile inference upon inference" to sustain a federal statute when its provisions regulated noneconomic activity). Indeed, the majority's expansive interpretation of Wickard's sanction of federal regulation of intrastate commerce "risks making a whole catalog of ordinary state crimes a concurrent violation of a single

_____

[6] As Judge Hill's dissent notes, the majority relies heavily upon this jurisdictional qualifier to uphold the constitutionality of § 247. While the Lopez Court faulted the federal statute in that case for its lack of a jurisdictional limitation, see Lopez, 514 U.S. at 561, 115 S. Ct. at 1631, it did not indicate that the presence of such a limitation would have by itself saved the statute from invalidation. Moreover, the Lopez Court's first and primary objection to the statute was that it was a criminal statute that lacked the requisite nexus to economic activity. See id. at 561. Accordingly, I attach more weight to what § 247 penalizes than to its inclusion of a jurisdictional qualifier.

74

congressional statute . . . ." Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 287, 113 S. Ct. 753, 768 (1993) (Kennedy, J., concurring). The commerce power has "outer limits," Lopez, 514 U.S. at 557, 115 S. Ct. at 1628, and § 247, as a regulation of noneconomic criminal activity, falls outside of those limits.

## III. Conclusion

While the burning of a church, "is offensive to the moral sense, . . . that fact must not close the eye to the question whether the power to punish therefor is delegated to Congress or is reserved to the State." Keller, 213 U.S. at 144, 29 S. Ct. at 471. In construing the Commerce Clause, we are charged with upholding the Constitution, implicit in which is a federalist design. Here, by failing to appreciate the significance of federalism, the majority has misconstrued the limits of the Commerce Clause and allowed a federal statute to regulate intrastate noneconomic conduct in an area of law traditionally protected from federal intrusion. Thus, the majority has burned yet another bridge to our federalist foundations. Because I believe that this incursion into State police powers is not sanctioned by the Constitution, I respectfully dissent.

HILL, Circuit Judge, dissenting, in which BIRCH, Circuit Judge, joins:

Under the authority of the Commerce Clause, Congress may regulate the *channels* and *instrumentalities* of interstate commerce, as well as certain activities affecting commerce. *United States v. Lopez*, 514 U.S. 549, 558-59 (1995). The instrumentalities of interstate commerce are those "persons or things" that *travel* in interstate commerce. *Id.* The channels of interstate commerce include all modes of interstate or foreign movement of commerce. *Id.* Thus, the instrumentalities and channels of interstate commerce encompass the concept of movement of commerce across state lines, and there has never been any serious question about Congress' authority to regulate and protect them. *Id.*

Congress authority to regulate *intrastate activities* was not always recognized by the Supreme Court. *United States v. E.C. Knight Co.*, 156 U.S. 1, 12 (1895) ("Commerce succeeds to manufacture and is not part of it"). Later, the Court recognized the necessity to protect interstate commerce from the burdens and obstructions that might be imposed by intrastate activities that have a "close and substantial relation" to it. *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937). Under such circumstances, the Court held, the regulation of intrastate activities that "affect" interstate commerce is within Congress' commerce power. *Id.* at 37. Even purely local activities, such as the wheat grown for personal

consumption in *Wickard v. Filburn*, 317 U.S. 111 (1942), although not in interstate commerce, may be regulated if the absence of regulation would undercut a larger regulatory scheme affecting interstate commerce. *Lopez*, 514 U.S. at 561.

The effect on interstate commerce of such an intrastate activity, however, must be *substantial* in order for the commerce power to reach it. *Id. See also United States v. Robertson*, 514 U.S. 669, 671 (1995) ("[t]he 'affecting commerce' test . . . define[s] the extent of Congress's power over purely *intra* state commercial activities that nonetheless have substantial *inter* state effects") (emphasis in original)). Thus, Congress' power to regulate intrastate activities is more limited than is its power to regulate the instrumentalities and channels of interstate commerce. Whereas Congress may regulate any instrumentality or channel of interstate commerce, the Constitution permits Congress to regulate only those intrastate activities that have a substantial effect on interstate commerce.

Furthermore, such regulation of intrastate activities has always been limited to *economic* activities. In *United States v. Morrison,* 529 U.S. 598, 613 (2000), the Court observed:

> Thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity *only* where that activity is economic in nature. . . . A review of Commerce Clause case law demonstrates that in those cases where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some

77

sort of economic endeavor.

(emphasis added) (citing *Lopez*, 519 U.S. at 559-60). Thus, Congress' power to regulate intrastate activities has always been limited to *economic* activities that have a *substantial effect* on interstate commerce.

To hold otherwise, the Court has observed, would "convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Lopez,* 514 U.S. at 567. This the Constitution does not permit. The Court has long recognized that:

> The Constitution requires a distinction between what is truly national and what is truly local. In recognizing this fact we preserve one of the few principles that has been consistent since the [Commerce] Clause was adopted. The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States. Indeed, we can think of no better example of the police power, which the Founders denied the National government and reposed in the States, than the suppression of violent crime and vindication of its victims.

*Morrison,* 529 U.S. at 617 (internal citations and quotations omitted). The Constitution withholds from Congress a general police power, and the Court has always "rejected readings of the Commerce Clause and the scope of federal power that would permit Congress to exercise [one]." *Lopez*, 514 U.S. at 596-97 (Thomas, J., concurring).

Congress has, nonetheless, frequently sought to exercise such a general

78

police power. Lacking authority to punish the crime itself, Congress used its power to keep the channels and the instrumentalities of interstate commerce safe to prohibit travel in interstate commerce to commit the crime.[1] But, in these statutes, the *travel* is the offense, not the common-law crime itself.

Section 247, however, is typical of a number of more recent statutes that seek to use the commerce power "to cast [a] remedy over a wider, and more *purely intrastate*, body of violent crime." *Morrison* at 613 (emphasis added). These statutes prohibit the *activity* of the violent crime itself, making it an offense against the United States to carry a gun in a school zone, commit arson, batter a spouse, or burn a church. *See* 18 U.S.C. §§ 922(q)(1)(A), 844, 13981, and 247. The Supreme Court has uniformly rejected these attempts to transform the commerce power into a general police power over intrastate crime.

In *Lopez*, the Court reviewed a congressional prohibition on possession of a firearm in a school zone. The Court held that because the knowing possession of a

---

[1]There are numerous federal statutes which do, explicitly, criminalize travel in interstate commerce in order to commit a traditional common-law crime. *See, e.g.,* 18 U.S.C. § 43 (traveling to engage in animal terrorism); 18 U.S.C. § 228 (traveling to avoid paying child support); 18 U.S.C. § 1073 (flight to avoid prosecution); 19 U.S.C. § 1074 (flight to avoid prosecution for destroying property); 18 U.S.C. § 1231 (interstate travel to engage in strikebreaking); 18 U.S.C. § 1958 (traveling to engage in murder for hire); 18 U.S.C. § 2101 (traveling to cause a riot); 18 U.S.C. § 2118 (traveling to engage in robbery involving controlled substances); 18 U.S.C. § 2261 (traveling to commit interstate domestic violence); 18 U.S.C. § 2261A (traveling to commit interstate stalking); 18 U.S.C. § 2262 (traveling to violate domestic protective order); 18 U.S.C. § 2423 (interstate travel to provide minors for sex). These statutes regulate crime by focusing on the criminal's movement in the channels of interstate commerce.

firearm in a school zone does not substantially affect interstate commerce, the Congress exceeded its authority under the Commerce Clause in making it a federal crime. *Id.* at 551.

Similarly, in *Morrison*, the Court examined Congress' attempt to provide a federal remedy for domestic violence. The Court first noted that domestic violence is not an economic activity. 529 U.S. at 610. Stating that "a fair reading of *Lopez* shows that the non-economic, criminal nature of the conduct at issue was central to our decision [that the statute was unconstitutional] in that case," the Court held that Congress' attempt to regulate the non-economic, purely local crime of domestic violence exceeded its authority under the Commerce Clause. *Id.*[2]

In *United States v. Jones*, 529 U.S. 848 (2000), the Court was called upon to interpret the federal omnibus arson statute, 18 U.S.C. § 844, which extends federal jurisdiction over the burning of any real property "used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." The government, seeking to prosecute the arson of an owner-occupied, private residence, argued that Congress' use of the words "affecting" interstate commerce

---

[2]The Court approved *sub silentio* a different provision of the Violence Against Women Act when it noted that Section 40221(a) of the Act, which prohibits *travel* to commit spousal abuse, has been uniformly upheld by the Courts of Appeals as an appropriate exercise of Congress' Commerce Clause authority to protect the use of the channels of interstate commerce. 529 U.S. at 613 n.5.

signaled Congress' intent to exercise its full authority under the Commerce Clause.

The Court, however, rejected the notion that the mere recitation of such words

rendered the statute immune from judicial review, and proceeded to examine the

quality of the connections between the residence and interstate commerce – the

receipt of natural gas, a mortgage and an insurance policy from out-of-state.  The

Court rejected these connections as too *de minimis*, holding that § 844 "does not

reach an owner-occupied residence that is not used for any commercial purpose."

*Id.* at 857.  The Court concluded that:

> "[g]iven the concerns brought to the fore in *Lopez*, it is appropriate to
> avoid the constitutional question that would arise were we to read §
> 844(i) to render the 'traditionally local criminal conduct' in which
> petitioner Jones engaged 'a matter for federal enforcement.'" . . .
> Section 844 is not soundly read to make virtually every arson in the
> country a federal offense.

*Id.* at 858.[3]

Section 247 also seeks to regulate a common-law state crime – church

burning.  Therefore, I believe our inquiry into Congress' attempt to regulate it

should proceed exactly as did the Supreme Court's in *Lopez*, *Morrison*, and *Jones*.

We should examine the intrastate, non-economic activity of church burning to

determine whether that activity may be regulated because it *substantially affects*

---

[3]In construing the statute not to reach the arson of a purely private residence, the court avoided Jones' constitutional claim that criminalization of such an arson is beyond the commerce power of Congress.  529 U.S. at 852.

interstate commerce.[4]

The en banc court's analysis of § 247, however, does not proceed in this way. Its analysis focuses not on the authority of Congress to regulate the intrastate *activity* of church burning, but rather on the meaning of the jurisdictional hook requiring that the offense be "in or affect" interstate commerce. The majority asserts that by criminalizing the church arson that is "in" interstate commerce, Congress intended to invoke its "fullest authority" under the Commerce Clause, including its power to protect the channels and instrumentalities of commerce. Therefore, the majority concludes, § 247 criminalizes the use of the channels and instrumentalities of commerce in connection with a church arson. Thus, church arson is a federal crime if the church burner *travels* in interstate commerce in order to burn a church.[5]

I find nothing to support this interpretation of § 247. The statute defines the offense as the arson, not travel to commit the arson, and the use of the word "in"

---

[4]Recently a panel of this court approached yet another congressional attempt to federalize a state crime – intrastate possession of child pornography – in exactly this way, holding that it too exceeded Congress' authority because the connection between the intrastate possession of pornography and interstate commerce was too attenuated to justify federal jurisdiction. *United States v. Maxwell*, 386 F.3d 1042 (11th Cir. 2004).

[5]Since the majority clearly *requires* such travel or the use of the instrumentalities for federal jurisdiction to attach, the statute will not apply to the purely local arsonist who burns the church down the street, as Congress clearly intended by its 1996 amendment deleting the travel requirement.

does not change that. The statute is Congress' attempt to punish the intrastate activity of church burning, not the use of the interstate highway to reach the church.

Nor can the recitation of "in or affecting" create federal jurisdiction where none is constitutionally permitted. Merely because Congress chooses to prohibit the church arson that is "in" interstate commerce does not mean that there is such a crime.[6] Whether church burning substantially "affects" interstate commerce is a highly problematic issue the majority does not even reach.[7]

I do agree, however, with the en banc court's conclusion that Congress intended to invoke its full power under the Commerce Clause in prohibiting church arson. In attempting to regulate a purely local activity, such as Wickard's wheat or church arson, Congress reaches the outer limits of its commerce power and invokes its full authority not because it may, but because it *must*. "In or affecting," however, is not a shibboleth that, having been correctly pronounced, opens the door to federal prosecution. As *Lopez*, *Morrison*, and *Jones* have made clear, no jurisdictional hook, nor any mantric invocation by Congress of its "fullest

---

[6]Similarly, "[s]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." *Lopez*, 514 U.S. at 557 n. 2.

[7]In the vacated opinion in this case, the panel held that Ballinger's crimes did not substantially affect interstate commerce. 312 F.3d 1264 (11th Cir. 2002).

83

authority under the Commerce Clause" can establish federal jurisdiction over an intrastate activity that judicial review determines does not have the constitutionally required substantial effect on interstate commerce.[8]

Thus, I do not agree with the conclusion of the en banc court that § 247's jurisdictional language transforms it from an attempt by Congress to push its commerce power to the limit by punishing the purely local and non-economic activity of church burning into an innocuous regulation of the channels or instrumentalities of interstate commerce by prohibiting the travel to burn the church. By collapsing the three *Lopez* categories of permissible regulation of commerce into one, all-purpose category that permits regulation of even purely local *non-economic* activities – such as violent crime – if someone or something associated with the activity moves in the channels or utilizes the instrumentalities of interstate commerce prior to the activity, the en banc court obliterates the Supreme Court's careful distinction between Congress' plenary power over the *channels* and *instrumentalities* of commerce, and Congress' much more limited power over intrastate economic *activities*, which may be regulated only if the local activity itself has a substantial effect on interstate commerce.

---

[8]The Court observed in *Morrison*, in response to the dissent, that "[u]nder our written Constitution, however, the limitation of congressional authority is not solely a matter of legislative grace." 529 U.S. at 616.

Furthermore, interpreting "in or affects" to permit Congress to make the local non-economic activity of *church burning* a federal crime merely because the arsonist crosses state lines to commit the crime, permits too much. I cannot think of any local activity that Congress could not regulate, nor any crime that Congress could not federalize under such an expansive interpretation of the commerce power. *Cf. Morrison*, 529 U.S. at 615 ("Indeed, if Congress may regulate gender-motivated violence, it would be able to regulate murder or any other type of violence since gender-motivated violence is a subset of all violent crime, is certain to have lesser economic impacts than the larger class of which it is a part").[9] Such an expansive interpretation would render null and void the Court's decisions in *Lopez*, *Morrison*, and *Jones*.

The underlying principles of federalism require that the reach of the commerce power over intrastate activities be limited to those economic activities that are *in* or, if purely local, substantially *affect* interstate commerce. Without enforcing the limits imposed by the Constitution, according to the Court in *Morrison*, "the concern that we expressed in *Lopez* that Congress might use the Commerce Clause to completely obliterate the Constitution's distinction between

---

[9]Of course, the Congress may prohibit travel to commit the offense of church burning as it has done in the other statutes mentioned above in n. 1. Then, however, the offense prohibited is the *travel*.

85

national and local authority seems well founded." *Id.* at 615.

The view that the distinction between the national and the truly local must be maintained is not a unanimous one in either the Congress or the Court.[10]  The *Morrison* majority remarked that the dissent's "remarkable theory [is] that the commerce power is without judicially enforceable boundaries."  529 U.S. at 608 n. 3.  This theory, although rejected thus far in our constitutional history, remains a seductive one when Congress, bent on doing good, does violence to the principles of federalism that have supported our republic for over two hundred years.

Ballinger is an evil doer and the evil that he has done is reprehensible. Because he has done these evil things, he is locked up and he should remain so. But to keep him there, I fear that today we step over the historical line so carefully drawn by the Court.

---

[10]Or, for that matter, in the Executive.  President Theodore Roosevelt once remarked that "little permanent good can be done by any party which . . . fails to regard the State, like the county or the municipality, as merely a convenient unit for local self-government."  Theodore Roosevelt, An Autobiography 351 (Charles Scribner's Sons 1924) (1913).