# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-3661
No. 22-1065

_____

United States of America

*Plaintiff - Appellee*

v.

Emily Claire Hari

*Defendant - Appellant*

_____

Appeals from United States District Court
for the District of Minnesota

_____

Submitted: December 14, 2022
Filed: May 10, 2023

_____

Before LOKEN, MELLOY, and KOBES, Circuit Judges.

_____

LOKEN, Circuit Judge.

In August 2017, Emily Hari loaded a pickup truck with a 20 pound pipe bomb, two assault rifles, and a sledgehammer and drove with two confederates from Illinois to the Dar al-Farooq Islamic Center in Bloomington, Minnesota. The trio smashed a window of the Imam's office before the parishioners' dawn prayer and threw

gasoline, diesel fuel, and the pipe bomb inside. The bomb detonated. No one was injured; the building suffered fire and smoke damage. Hari and the others fled.

After an extensive investigation, the FBI arrested Hari, Joe Morris, and Michael McWhorter, members of a white supremacist paramilitary organization founded by Hari known as the "White Rabbits."[1] The jury convicted Hari of five federal offenses. Four are at issue on appeal: Count 1, intentionally damaging religious property because of its religious character in violation of 18 U.S.C § 247(a)(1); Count 2, obstructing by force the free exercise of religious beliefs in violation of 18 U.S.C. § 247(a)(2); Count 3, conspiracy to commit Counts 1 & 2 by means of fire or explosive in violation of 18 U.S.C. § 844(h, m); and Count 4, carrying or using a destructive device during or in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1).

Prior to trial, Hari moved to dismiss Counts 1-4, arguing that § 247 is facially invalid because it exceeds congressional authority conferred by the Commerce Clause. Hari also argued Count 4 must be dismissed because the predicate § 924(c)(1) felonies, 18 U.S.C. §§ 247(a)(1) and (a)(2),[2] include use of force against

---

[1]Prior to Hari's trial, McWhorter and Morris pleaded guilty to separate charges brought in the Central District of Illinois in plea agreements that resolved both cases. They testified for the government at Hari's trial.

[2]Section 247(a) provides:

(a) Whoever, in any of the circumstances referred to in subsection (b) of this section --
(1) intentionally defaces, damages, or destroys any religious real property, because of the religious character of that property, or attempts to do so; or
(2) intentionally obstructs, by force or threat of force, including by threat of force against religious real property, any person in the enjoyment of that person's free exercise of religious beliefs, or attempts to do so;
shall be punished as provided in subsection (d).

one's *own* religious property and are therefore broader than the definition of a federal crime of violence in 18 U.S.C. § 924(c)(3). In a separate motion, Hari argued the prosecution violated the Sixth Amendment when it received defense-strategy materials protected by the attorney-client privilege before the trial.

In separate orders, the district court[3] denied the two motions to dismiss, concluding (i) Congress permissibly enacted § 247 under its Commerce Clause powers as defined in United States v. Lopez, 514 U.S. 549, 558-59 (1995); (ii) §§ 247(a)(1) and (a)(2) are not impermissibly broad under § 924(c)(3); and (iii) the government neither knowingly intruded into privileged materials nor was there a risk the prosecution would prejudicially use the materials at trial. The jury then convicted Hari of all counts, and the court imposed a sentence of 636 months' imprisonment. Hari appeals, raising these same issues and arguing, with regard to the second, that the Supreme Court's recent decision in United States v. Taylor, 142 S. Ct. 2015 (2022), overruled the district court's analysis of why §§ 247(a)(1) and (a)(2) are not overbroad predicate felonies. We affirm.

## I. The Commerce Clause Issue

The Constitution grants Congress the power to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. In United States v. Lopez, the Supreme Court clarified "three broad categories of activity that Congress may regulate under its commerce power. First, Congress may regulate the use of the channels of interstate commerce. . . . Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. . . .

---

[3]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota, adopting the Report and Recommendation of the Honorable Hildy Bowbeer, United States Magistrate Judge for the District of Minnesota.

Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce." 514 U.S. 549, 558-59 (1995).

In Lopez, the Court held that the federal statute prohibiting knowing possession of a firearm in a school zone, 18 U.S.C. § 922(q)(1)(A), exceeded Congress's power to regulate interstate commerce. The majority opinion "quickly disposed of" the first two categories, concluding the statute did not regulate the channels of interstate commerce, prohibit interstate transportation of a commodity, or protect an instrumentality or thing in interstate commerce. Id. at 559. After lengthy analysis, the majority also concluded that § 922(q) could not be upheld under the third category -- regulation of an activity that substantially affects interstate commerce. The Court noted that § 922(q) "contains no jurisdictional element which would ensure, through case-by-case inquiry that the firearm possession in question affects interstate commerce." Id. at 561. Three Justices joined in separate opinions.

In response to Lopez, Congress amended 18 U.S.C. § 247 to add a jurisdictional element in § 247(b): "(b) The circumstances referred to in subsection (a) are that the offense is in or affects interstate or foreign commerce." It is well established that the statutory phrase, "in or affects interstate or foreign commerce," is a "term of art that indicates a congressional intent to invoke the full extent of its commerce powers." United States v. Mosby, 60 F.3d 454, 456 (8th Cir. 1995). Hari argues that § 247(a) was "*ultra vires*" and "amounts to no law at all"[4] because it exceeds Congress's Commerce Clause powers. We join other circuits that have considered and rejected similar contentions. See United States v. Roof, 10 F.4th 314, 382-84 (4th Cir. 2021), cert. denied, 143 S. Ct. 303 (2022); United States v. Ballinger,

---

[4]These phrases, drawn from dicta in cases having no relevance to the issue on appeal, are an obvious attempt to avoid deferential rational basis review of Hari's purported facial attack on the statute. See Gonzales v. Raich, 545 U.S. 1, 22 (2005).

395 F.3d 1218 (11th Cir. 2005) (en banc); United States v. Grassie, 237 F.3d 1199, 1211 (10th Cir. 2001) (rejecting as-applied challenge).

We begin by noting the apparent absurdity of the notion that Congress lacked Commerce Clause authority to make Hari's criminal activity a federal offense. The conspirators traveled from Illinois to Indiana to purchase explosives, then drove on interstate highways to Minnesota for the purpose of bombing a prominent mosque that is the religious, cultural, and economic center in the lives of its parishioners, many of whom are immigrants from Somalia who were invited by the federal government to settle in the United States when they fled their war-torn native country. The international pursuit of religious freedom has economic roots.

For this reason, we agree with the government and our sister circuits that § 247(a) is a legitimate exercise of Congress's power to punish offenders who "rely on the channels and instrumentalities of commerce in committing criminal acts" -- the first two categories of Commerce Clause power that were not at issue in Lopez. Ballinger, 395 F.3d at 1229; see Roof, 10 F.4th at 386. The House Judiciary Committee made its intent in this regard explicit:

> [T]he Committee intends that where in committing, planning, or preparing to commit the offense, the defendant either travels in interstate or foreign commerce, or uses the mail or any facility or instrumentality of interstate or foreign commerce, the statute will be satisfied.

H.R. Rep. No. 104-621, at 7 (1996). "[N]o additional showing of an interstate nexus is necessary when a statute regulates an instrumentality of interstate commerce." United States v. Corum, 362 F.3d 489, 494 (8th Cir. 2004). Hari does not address this issue. The Reply Brief simply asserts that "a facial challenge to § 247 under the 'substantial effects' category is permissible, with the corresponding four-part Lopez [test] fully applicable." The cited authority, United States v. Crenshaw, 359 F.3d 977, 985-86 (8th Cir. 2004), says no such thing.

-5-

Turning to this third category that is the sole focus of Hari's briefs, the Supreme Court majority in Lopez identified four considerations in determining that § 922(q)(1)(A) did not substantially affect interstate commerce: it was a criminal statute having nothing to do with commerce or an intrastate activity substantially affecting commerce; it contained no express jurisdictional element limiting its reach to activity having a connection with or effect on commerce; Congress made no findings in the statute or legislative history regarding effects on interstate commerce; and the link between gun possession and a substantial effect on interstate commerce was attenuated. See United States v. Morrison, 529 U.S. 598, 610-13 (2000); United States v. Anderson, 771 F.3d 1064, 1067–68 (8th Cir. 2014).

Hari argues that § 247(a) regulates "acts of property damage and obstruction, targeted against and motivated by religion," like the "paradigmatic common-law state crime" of arson at issue in Jones v. United States, 529 U.S. 848 (2000).[5] Thus, Hari posits, "the regulated acts are traditional crimes of local concern, and unrelated to economic activity or interstate commerce. . . . This first and 'central' factor strongly cuts against the facial validity of § 247." We disagree with the underlying premise. As we noted in United States v. Rea, Congress intended the arson statute at issue in Jones "to encompass all commercial property, including, among other things, schools, police stations, and places of worship." 300 F.3d 952, 960 (8th Cir. 2002), citing Russell v. United States, 471 U.S. 858, 860-61 (1985). Church buildings are used for a broad range of educational, recreational, and financial activities. See Grassie, 237 F.3d at 1204. The statute's legislative history references numerous ways in which houses of worship broadly contribute to commercial activities. See, e.g., 142 Cong. Rec. S7908–04 at *S7909 (1996) (joint statement of floor managers).

---

[5]Unlike § 247(b), the arson statute at issue in Jones, 18 U.S.C. § 844(i), applies only to arson of property "used in" commerce or an activity affecting commerce. Id. at 850.

Even more important, while economic activity is certainly a "central" factor to the Commerce Clause inquiry, the presence of a jurisdictional element in the statute is perhaps the most important factor because it "allows application of the statute only where the defendant's conduct falls within the regulatory scope of the Commerce Clause." Roof, 10 F.4th at 383. Here, the statute specifically requires that the offense "affects interstate or foreign commerce." This "ensures, through a case-by-case inquiry, that each defendant's [offense] affected interstate commerce." United States v. Bausch, 140 F.3d 739, 741 (8th Cir. 1998). The jurisdictional element was added to "mirror the Supreme Court's articulation in Lopez of the nature and extent of the commerce power." Ballinger, 395 F.3d at 1234-35 (detailing legislative history).

In response, Hari properly notes that in United States v. Crenshaw, we declined to "read [Lopez and Morrison] to say that the presence of a jurisdictional element *per se* demonstrates that a statute meets the substantial effects test." 359 F.3d 977, 985 (8th Cir. 2004). But in Crenshaw, we went on to reject the Commerce Clause challenge to defendants' convictions, so this passage was precautionary dicta, consistent with cautions in Lopez, 514 U.S. at 557 n.2, and in Morrison, 529 U.S. at 613. The Fourth Circuit has not found, and we have not found, "any case in which a federal criminal statute including an interstate commerce jurisdictional element has been held to exceed Congress's authority under the Commerce Clause." Roof, 10 F.4th at 383 n.43 (quotation omitted). The prudent cautions in Lopez, Morrison, and Crenshaw made no attempt to define when an express jurisdictional element should be overruled or disregarded. Hari makes no attempt to fill the void. Given that rational basis review applies to this issue, and the unanimous conclusions of our sister circuits, we conclude the district court properly rejected Hari's Commerce Clause challenge to § 247.

## II. Crime of Violence Issues

Hari was convicted in Count 4 of knowingly carrying or using a destructive device "during and in relation to any crime of violence." 18 U.S.C. § 924(c)(1). As relevant here, crime of violence is defined as "an offense that is a felony and . . . has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A) (the "force clause"). Hari argues that the two charged predicates, 18 U.S.C. §§ 247(a)(1) and (a)(2), are not predicate "crimes of violence" because each is categorically broader than 18 U.S.C. § 924(c)(3). The government notes that Hari was charged with committing two offenses that qualify as crimes of violence, Count 1 and Count 2. The jury convicted Hari of both offenses; therefore, we need only conclude that one of these offenses is a crime of violence under § 924(c)(3) to uphold the Count 4 conviction for using a destructive device during and in relation to *any* crime of violence in violation of § 924(c)(1). We agree. We will begin with Hari's contention that the violation of § 247(a)(2) (Count 2) is not a § 924(c)(3) crime of violence.

The parties agree on essential aspects of this inquiry. "To determine whether an underlying offense has as an element the 'use . . . of physical force' against the person of another, we apply a categorical approach that compares the elements of the offense of conviction with the requirements of the 'force' clause. Where the statute in question defines multiple crimes, we apply the modified categorical approach and consider only the offense of which the defendant was convicted." McCoy v. United States, 960 F.3d 487, 489 (8th Cir. 2020) (citations omitted). Hari concedes that an element of § 247(a)(2) is the use or threatened use of physical force against a person but argues, relying in large part on the Supreme Court's recent decision in United States v. Taylor, that the statute is overbroad because it includes the use of physical force to obstruct free exercise of the religious beliefs of any person by using a pipe bomb to damage religious real property, whereas § 924(c)(3) is limited to the use of physical force against "the person or property of another."

-8-

In Taylor, the Court held that a conviction for attempted Hobbs Act robbery did not constitute a crime of violence because it did not *necessarily* involve the use of force or threatened force as § 924(c)(3)(A) requires. 142 S. Ct. 2015, 2020-21 (2022). As applied to this case, Hari argues, Taylor held that "[t]he only relevant question is whether the federal felony at issue always requires the government to prove -- beyond a reasonable doubt, as an element of its case -- the use, attempted use, or threatened use of [physical force against the person or property of another]." Id. at 2020. Thus, Taylor casts substantial doubt on use of the "realistic probability" test to determine whether a statute applies to conduct that falls outside the force clause, a test we have repeatedly applied in interpreting various state and federal offenses,[6] on which the district court understandably relied in its pre-Taylor ruling.

Section 247(a)(1) (1) is violated by whoever "intentionally defaces, damages, or destroys any religious real property, because of the religious character of that property, or attempts to do so." Hari's argument as applied to Count 1 is straightforward -- focusing on the literal breadth of the term "*any* religious real property," Hari argues the statute is unambiguously overbroad because it includes damaging one's own religious real property, here by use of a pipe bomb, whereas § 924(c)(3) is limited to the use of physical force against the property of another.

Section 247(a)(2) is violated by whoever "intentionally obstructs, by force or threat of force, including by threat of force against religious real property, any person in the enjoyment of that person's free exercise of religious beliefs, or attempts to do so." Hari extends the Count 1 argument to Count 2, contending that "in the form charged here," § 247(a)(2) is also overbroad because the prohibited use of force

---

[6]See, e.g. United States v. Swopes, 886 F.3d 668, 671 (8th Cir. 2018) (en banc); Mowlana v. Lynch, 803 F.3d 923, 925 (8th Cir. 2015). The impact of Taylor on these otherwise controlling precedents is uncertain and need not be considered in this case. See United States v. Bragg, 44 F.4th 1067, 1076 (8th Cir. 2022), cert. denied, No. 22-6130 (S. Ct. Mar. 27, 2023).

includes force "against religious real property" (the mosque), which again includes one's own religious property. There is a fatal flaw in this argument. In § 247(a)(2), use of force against religious real property is only a *means* of committing the offense. The element -- which is the focus of the <u>Taylor</u> inquiry -- is intentionally obstructing by force or threat of force the enjoyment of a person's free exercise of religious beliefs. <u>See</u> <u>Mathis v. United States</u>, 136 S. Ct. 2243, 2249 (2016). Thus, considering this offense under the modified categorical approach, the elements fall within the force clause as defined in § 924(c)(3).

Having concluded that Hari's § 247(a)(2) conviction in Count 2 was a crime of violence conviction under § 924(c)(3), we need not consider the more complex question whether the Supreme Court's supervening decision in <u>Taylor</u> overruled the district court's decision that the § 247(a)(1) conviction in Count 1 was also a crime of violence. <u>See</u> note 6, <u>supra</u>. We affirm Hari's Count 4 conviction.

## III. The Sixth Amendment Issue

In December 2019, the prosecution informed defense counsel that it had accidently received materials protected under the attorney client privilege. In a January 9, 2020 letter, an Assistant U.S. Attorney explained that, while reviewing discovery materials for disclosure, another AUSA saw an FBI document summarizing six recorded jail calls between Hari and defense counsel in February 2019, while Hari was detained in an Illinois jail. The letter attached the summaries, which reflected four calls in which Hari left a voicemail, and two calls in which Hari and counsel discussed filing a motion to prevent Hari from being moved to Minnesota. The letter stated the AUSA read only the header of the FBI summary.

The letter further stated that a government attorney and an FBI agent not part of Hari's prosecution team promptly conducted a privilege review of all reports summarizing Hari's jail calls. The review team found FBI "Serials" that included

police officer summaries of Hari's calls from an Illinois jail. The summaries noted a call to an attorney but not the substance of the calls. Disks containing copies of these jail calls and summaries were produced to the defense in February 2019. The review team confirmed that no member of Hari's prosecution team was exposed to attorney-client information. The team removed the FBI document received in December from the U.S. Attorney Office's database and "walled off" the FBI agents involved in the document from the prosecution team.

In February 2020, Hari moved to dismiss the indictment, claiming interference with privileged communications that violated the Sixth Amendment. Supplemental briefs to the district court disclosed that staff at the Anoka County, Minnesota jail, where Hari was detained pending trial, conducted "shakedowns" of the cell because Hari was considered an escape risk. In July 2019, jail staff seized two pages of handwritten notes. Hari claimed the notes were made while reviewing discovery following a meeting with counsel and reflected trial strategy review with counsel. FBI Special Agent Brenda Kane received the document from jail staff on September 6, 2019 and forwarded it that night to the prosecution team. At 6:45 the next morning, AUSA John Docherty told all recipients not to look at the document because "[i]t is possible it is notes Hari took for an upcoming meeting with [counsel]." The district court found that Agent Kane did not look at the document and the three AUSAs did not open or view the document.

On October 9, 2020, the district court denied the motion to dismiss the indictment because Hari "failed to demonstrate a Sixth Amendment violation." There was no showing the government knowingly intruded on Hari's attorney-client relationship. The government discovered it inadvertently received readings of jail calls by Hari to counsel and immediately confirmed that prosecutors were not exposed to the information. The notes found in Hari's cell in July 2019 were forwarded to Agent Kane in September, and the prosecution team was promptly directed not to look at them. "Based on the record before the Court, there is no risk

-11-

that the prosecution will use any substance of any of the attorney-client communications at trial." Hari's ten-day trial began November 9, 2020.

Hari argues the district court erred in denying Sixth Amendment relief because "governmental intrusions upon attorney-client privileged materials, pertaining to defense and trial strategy, violate the Sixth Amendment right to effective assistance of counsel." To establish this violation, "a criminal defendant must show two things: first, that the government knowingly intruded into the attorney-client relationship; and second, that the intrusion demonstrably prejudiced the defendant, or created a substantial threat of prejudice." United States v. Singer, 785 F.2d 228, 234 (8th Cir. 1986) (citations omitted). This contention is without merit for several reasons.

First, the district court found Hari made no showing the government knowingly intruded on the attorney-client relationship. Hari cites the general rule, "we review claims of constitutional error *de novo*." United States v. Sawatzky, 994 F.3d 919, 923 (8th Cir. 2021). True enough, but the relevant Sixth Amendment issue of law we review *de novo* was established in Singer -- Hari must prove an act of "deliberate intrusion" to establish the claim. United States v. Tyerman, 701 F.3d 552, 559 (8th Cir. 2012). Whether the government knowingly intruded certainly looks like a finding of fact we would review for clear error, though we have not found a case addressing the issue. In addressing the merits of this issue, Hari simply argues that jail staff knowing intruded and in Sawatzky, 994 F.3d at 923, we presumed the actions of jailers who record jail calls and seize papers are imputed to the government in deciding this issue. First, the opinion in Sawatzy said no such thing -- we simply presumed without deciding the government knowingly intruded by seizing documents from defendant's cell and decided no prejudice was shown. Moreover, Hari failed to prove knowing intrusion into the attorney-client relationship by jail staff or other government officials. As the district court noted, nothing on the face of the notes found during the security-focused July 2019 shakedown of Hari's cell indicated potential privilege.

Second, in an order filed two months before trial, the district court found no risk the prosecution will use the substance of attorney-client communications at trial. Hari makes no showing the materials in question were even referred to at trial, much less used as substantive evidence in the government's case. "[W]hen conversations with counsel have been overheard, the constitutionality of the conviction depends on whether the overheard conversations produced, directly or indirectly, any of the evidence offered at trial." Weatherford v. Bursey, 429 U.S. 545, 552 (1977). Here, Hari failed to "demonstrate that the information allegedly acquired . . . was used by the state in some way." Clark v. Wood, 823 F.2d 1241, 1249 (8th Cir. 1987).

Third, Hari must prove the second part of the Sixth Amendment inquiry, prejudice or a substantial threat of prejudice. Sawatzky, 994 F.3d at 923. We review the district court's finding of no prejudice for clear error. Singer, 785 F.2d at 237. As in Sawatzky, assuming, without deciding, that the government knowingly intruded into the attorney-client relationship when officers seized privileged documents from Hari's cell, the district court did not clearly err in finding no prejudice. Hari argues the notes seized in July 2019 related to defense strategy for dealing with cooperators, and "the strategy information . . . may have made its way to McWhorter and Morris in any number of ways." Based on this speculation, which has no support in the record, Hari urges us to vacate and dismiss the prosecution, or remand for a new trial.

"[A]bsent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate." United States v. Morrison, 449 U.S. 361, 365 (1981). And where, as in this case, defendant "has demonstrated no prejudice of any kind, either transitory or permanent, to the ability of her counsel to provide adequate representation in the[] criminal proceedings," any Sixth Amendment violation "provides no justification for interfering with the criminal proceedings." Id. at 366.

The judgment of the district court is affirmed.

_____